Commonwealth *v.* Holton, Appellant.

Argued November 24, 1967. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Bernard L. Segal,* First Assistant Defender, with him *Melvin Dildine,* Assistant Defender, and *Herman I. Pollock,* Defender, for appellant.

*James D. Crawford,* Assistant District Attorney, with him *Alan J. Davis,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, October 11, 1968:

During the early morning hours of April 5, 1965, an unknown male surreptitiously entered the Philadelphia apartment of a female medical student at Jefferson Medical College, and brutally beat and raped her. Charles Holton was arrested for these crimes and eventually was convicted by a jury of assault and battery, aggravated assault and battery, assault and battery with intent to ravish, rape, and larceny. Post-trial motions in arrest of judgment and for a new trial were denied, following which an aggregate prison sentence of 21½ to 43 years was imposed. On appeal the Superior Court affirmed without opinion. Judge HOFFMAN filed a dissenting opinion. See 209 Pa. Superior Ct. 22, 223 A. 2d 754 (1966). We granted allocatur and now reverse and order a new trial, because we conclude that Holton's trial violated the requirements of due process of law.

Holton was taken into custody by two investigating police officers without a warrant on April 7, 1965, at about 11:30 a.m., and escorted to the police administration building. At about 4:30 p.m., or after a delay of approximately 5 hours, occasioned by the fact that the officers were attempting to ascertain whether the victim[1] was physically able to confront Holton, a "formal interrogation" commenced. Within minutes thereafter,[2] according to the police officers whose testimony

---

[1] Because of the seriousness of her injuries, the victim was hospitalized.

[2] Holton's testimony differed in material part, but for the purposes of this appeal we accept the Commonwealth's testimony as true.

was offered by the Commonwealth, Holton spontaneously stated: "Look, I broke into that house, but I don't remember raping that girl." He was immediately warned by one of the questioning officers: "Now I have to advise you anything you say is going to be used either for or against you. Now you don't have a lawyer, so you still don't have to make a statement. But if you want a lawyer you will either get one at a hearing tomorrow morning. . . . If you care not to make a statement now, don't make it." Holton was then taken downstairs to a cafeteria for a cup of coffee and minutes later, upon being returned to the "interview room," he orally admitted his guilt. Evidence of his statement was introduced, over objection, at trial.[3]

Holton was taken into custody solely on the basis of a tip given to the police by an unidentified informer. This informant concededly was not an eyewitness to the crimes and did not have personal knowledge of Holton's whereabouts at the time of the occurrence. Neither at the hearing on the motion to suppress the evidence of Holton's incriminating statement, nor at the trial itself, did the arresting officers reveal any facts or circumstances disclosed by the informant which led to the belief Holton had committed the crimes involved. Hence, as far as this record is concerned, the arrest was illegal.

An arrest without a warrant must be based on probable cause, i.e., there must be facts available to the officers at the moment of the arrest which "would warrant a man of reasonable caution in the belief" that the individual arrested has committed an offense. *Carroll v. United States,* 267 U.S. 132, 162, 45 S. Ct. 280 (1925); *McCray v. Illinois,* 386 U.S. 300, 87 S. Ct. 1056 (1967). Mere suspicion is not enough and the burden is upon the Commonwealth to show with rea-

---

[3] A pretrial motion to suppress was denied after hearing.

sonable specificity facts sufficient to establish that probable cause existed. *Beck v. Ohio*, 379 U.S. 89, 85 S. Ct. 223 (1964). The instant record is barren of such proof.

The illegality of Holton's arrest does not necessarily preclude the use of his subsequent incriminating statement as evidence. This depends upon a determination of whether or not the statement was the product of the exploitation of the initial illegality or was secured by means sufficiently distinguishable from that illegality to purge it of the primary taint. *United States v. Wade*, 388 U.S. 218, 87 S. Ct. 1926 (1967); *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407 (1963); *Commonwealth ex rel. Craig v. Maroney*, 348 F. 2d 22 (3d Cir. 1965); and *Commonwealth v. Bishop*, 425 Pa. 175, 228 A. 2d 661 (1967). However, since we conclude that the use of Holton's statement was precluded for another equally important reason, we need not resolve this question.

At the suppression hearing and at trial, Holton testified that while he was in custody and questioned by the police, he was "getting the d.t.'s" as an aftermath of prior consumption of too much alcohol; that he was continuously sick and suffered from nausea and pains in the stomach and head; that he was cold, sweaty and shaking all over; that he requested medical assistance which was refused but promised "when it was all over"; that after relentless questioning by several police officers he finally agreed to admit anything they wanted him to in order "to get out of the place for a while . . . and get some fresh air." While the police officers' testimony denied much of the foregoing[4] and painted a different picture of Holton's physical condition at the pertinent time, *uncontradicted* facts in the record

---

[4] Some of this testimony was of a negative nature, such as, "I didn't see any sweating."

reveal that Holton's condition was more or less as he himself described.

(1) At the hearing before the committing magistrate on April 12, 1965, when asked a question relating to Holton's condition during the police questioning, the chief investigating officer and interrogator testified as follows: "He [Holton] had problems with his drinking and blackouts in certain areas. And he wasn't very coherent on that day I questioned him;" (2) During the period Holton was in custody he requested and drank an unusually large amount of water; (3) During the period of questioning Holton complained of pains in the stomach and was given an antacid pill by the police; (4) Immediately after he admitted his guilt, Holton was permitted to lie down on the floor for about 30 minutes; (5) Shortly thereafter, Holton was taken via automobile to the place where he told the police he had hidden certain articles stolen from the victim's apartment (but which were not there when the searching party arrived). During the return trip Holton's condition was such that the accompanying police officers stopped at a bar and got him a glass of wine; (6) On the morning of April 8th, a physician at the Detention Center of the Philadelphia Prison system, after examining Holton, concluded that he was "a chronic alcoholic who has had several episodes of d.t.'s" and directed that he be placed on the center's "alcohol withdrawal regime," which included, inter alia, the consumption of medicine three times a day to arrest the withdrawal incidents; (7) On April 9th, a consulting psychiatrist of the Philadelphia Prison system saw Holton and diagnosed and described his condition as follows: "In the state of withdrawal from alcohol . . . . In a withdrawal state but not full-blown d.t.'s . . . exceptionally anxious, nervous, overwrought, gave indications of being somewhat agitated . . . This was possible prodrome to a delirium tremens state."

Due process prohibits the evidentiary use of a criminal defendant's incriminating statements unless it is first established that those statements were "the product of a rational intellect and a free will." *Lynumn v. Illinois,* 372 U.S. 528, 83 S. Ct. 917 (1963), and *Townsend v. Sain,* 372 U.S. 293, 83 S. Ct. 745 (1963). The determination of whether or not such evidence meets these required standards depends on a consideration of the "totality of the circumstances." *Davis v. North Carolina,* 384 U.S. 737, 86 S. Ct. 1761 (1966); *Blackburn v. Alabama,* 361 U.S. 199, 80 S. Ct. 274 (1960); *Lyons v. Oklahoma,* 322 U.S. 596, 64 S. Ct. 1208 (1944); and *Commonwealth ex rel. Gaito v. Maroney,* 422 Pa. 171, 220 A. 2d 628 (1966). And the accused's physical and mental condition must be considered, for sickness or ill health may well influence his will to resist and make him prone to overbearing and improper questioning. *Reck v. Pate,* 367 U.S. 433, 81 S. Ct. 1541 (1961). For the inquiry as to the voluntariness of a defendant's incriminating statements cannot be narrowed to a consideration of whether or not the police resorted to physical abuse in procuring them; equally relevant on the issue of voluntariness is the determination of whether or not the accused's will was overborne at the time he made the statements. *Reck v. Pate,* supra.

After a careful consideration of all the relevant circumstances disclosed by this record, particularly the unchallenged facts related before, we unhesitatingly conclude that Holton's incriminating statement should have been excluded. These words of Mr. Justice ROBERTS, speaking for a unanimous Court, in *Commonwealth ex rel. Gaito v. Maroney,* supra, at 179 are most apt: "Our judgment is based not only on the lack of a rational choice on the part of appellant but also on 'a strong conviction that our system of law enforce-

ment should not operate so as to take advantage of a person in this fashion.' "

At least one other incident at trial requires discussion.

After the jury had deliberated for 22 hours without reaching a verdict, further instructions were requested "on the identification and alleged statement of the defendant." These instructions were given and then the trial judge finalized his remarks in this manner: "Now, you have taken a long time considering this case. You are citizens of this city, and you are citizens of America, and act as such. You are not living in a foreign country. You are here in a land of freedom where we try to protect people, and that's all the people, not just some of the people, everybody needs protection of the courts. If they don't get protection of the courts, you won't get protection of the courts either when your day comes in court. Remember that. You destroy the principles upon which democracy sits in America by not giving proper and adequate consideration, they won't be existing for you when you have your day in court. I'm not telling you what kind of verdict to bring in, but I'm telling you to stand up like men and women and do what you should do before your God to whom you will answer some day whether you answer to this court or not. You will answer to God some day for the way you conduct yourselves in this case. The chips will be down, and He will know everything you have done. You won't withhold one thing from Him." Twenty minutes later, the jury found Holton guilty.

While we are admiringly aware of the trial judge's intense patriotism and dedication to his religious convictions, it is our view that the portion of his supplemental charge, quoted above, was improper. Judge HOFFMAN pointedly expressed the sin and prejudicial

effect thereof in his dissenting opinion. 209 Pa. Superior Ct. 22 at 27: "Appellant contends that this exhortation amounted to binding instructions to the jury to bring in a verdict of guilty. The Commonwealth argues, on the other hand, that this charge suggested to the jury that it should acquit appellant.

"It is not for us to determine the court's intent in making this statement or the jury's inference from it. What is significant is that both interpretations are equally plausible. More importantly, individual jurors might have concluded, as appellant suggests, that the court was threatening them with the wrath of God should they bring in a verdict of not guilty."

The order of the Superior Court and the judgments of the Courts of Oyer and Terminer and Quarter Sessions are reversed and a new trial is ordered.

---

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE JONES:

I agree with the majority view that the remarks of the trial judge made after giving additional instructions to the jury were "improper" and highly prejudicial.

I disagree, however, with the view expressed in the majority opinion "that Holton's incriminating statement should have been excluded."

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I very strongly dissent. I would affirm the Order of the Superior Court and the Judgment of the lower Court.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Majority Opinion in this case is legalism run riot, it is conjecture ballooned into theory, theory stretched into assumed facts, imagined facts made the

basis for non sequiturs, and non sequiturs built into a decision which makes a mockery of the law, a travesty of justice, and one which will cause laymen to wonder if the courts are intended to seek truth or to play charades with the safety of the people. The courts should have but one goal and this is to apply reason to facts and from the amalgam produce a result which vindicates truth.

The decision in this case, however, makes a shambles of truth. No one can read the record and honestly conclude that the defendant was not proved guilty beyond a reasonable doubt, aye, proved guilty beyond the peradventure of hypothetical doubt. And what was he found guilty of? His crime was perhaps the most revolting, next to murder, in the whole calendar of horrendous dereliction. A jury of his peers, after hearing evidence for a week, rendered a verdict that established that the defendant, in the middle of the night, broke into a house, terrified a woman in bed by suddenly appearing before her with a knife which he placed to her neck and threatened to slit her throat unless she submitted to his bestial lust. He violated her carnally, gagged her, and then trussed her up with wire like a sheep prepared for slaughter, stole and made away with valuable articles in the house, leaving his victim in a state which could have caused her death from strangulation or from bleeding. And the most positive assurance of his guilt is that the defendant admitted his guilt. He confessed to his crime freely and voluntarily and without any pressure being applied through coercion, persuasion or other means.

The Majority Opinion says that the defendant's incriminating statements were not the product of "a rational intellect and free will," arguing the defendant was ill at the time the police questioned him.

If ever I saw hyperbole in a Court Opinion, I see it in the Majority Opinion in this case. There is utterly nothing in the record to support the extravagant utterance that Holton did not speak of his own free will and, so far as the limitations of his primitive tendencies were concerned, did not speak with a rational intellect. The disabling infirmity of the Majority Opinion is that it takes its facts from the defendant's account, wholly ignoring that in appeals the appellate court accepts its facts from the side which has predominated in the verdict, here, the Commonwealth. The Majority Opinion astoundingly casts aside what was well said by our Chief Justice BELL in the case of *Commonwealth v. Kirkland,* 413 Pa. 48: "Defendant relies, as most defendants do in an appellate Court, on the testimony and the inferences which are favorable to her. As we have said very many times, this is not the law. In the recent case of Commonwealth v. Gooslin, 410 Pa. 285, 189 A. 2d 157, we said (page 287) : ' " ' . . . "It has become customary for a defendant in his argument before an appellate Court to base his claims and contentions upon his own testimony or that of his witnesses even after the jury has found him guilty. This, of course, is basic error. After a plea or verdict of guilty, 'we accept as true all of the Commonwealth's evidence upon which, if believed, the jury [or a judge sitting as a jury] could have properly based its verdict: [citing numerous authorities].' " ' " ' "

A jury of twelve persons, after hearing evidence for some eight days, concluded that Holton was a liar, but the Majority nevertheless lifts him to the pedestal of Uncontaminated Veracity. It does more, it polishes the statue by smoothing over the rough spots of inconsistency and incredulity and makes of the defendant an invalid and a helpless victim of police mercilessness. There is no marble in the quarry of fact to

produce the meretricious piece of sculpture the Majority passes off as Candor.

The Majority says that: "While the police officers' testimony denied much of the foregoing [claimant's account of symptoms of illness] and painted a different picture of Holton's physical condition at the pertinent time, *uncontradicted* facts in the record reveal that Holton's condition was more or less as he himself described."

Ordinarily, when one is attempting to slip over a piece of oral prestigiation, he speaks softly, hoping that no one will note his veering from the facts, but the Majority Opinion shouts its deviation from the record by underscoring *uncontradicted*. Holton's claims of incapacitation were, in fact, contradicted numerously. J. DeBenedetto, one of the officers who interrogated the defendant at the Police Administration Building, testified that the defendant "made no complaint of being ill." Of course, here he means illness in a serious sense. Obviously the defendant was not happy. He was in the hands of the law after his horrible crime. He had broken into a home in the middle of the night, he had threatened to kill a woman, he had violently raped that woman, he had tied her up with wire in such a fashion that she could have died, he had committed burglary, and now he knew that the time had come to pay the fiddler for the dance he had danced. The Majority makes much of the fact that Holton sweated. It would surely be most unusual if, knowing what he was now to face, he would not sweat.

The Majority says that Holton's statements about his supposed illness were "unchallenged facts." This is like saying that no one challenges Russia's attempt to sovietize Asia. Why, the record teems with challenge of the defendant's playing possum. The Majority has to admit that the police denied that Holton was

not in an incapacitated state, but adds that this testimony of the police was of a "negative nature, such as, 'I didn't see any sweating.' " If this isn't quibbling of a gargantuan character, the word has lost meaning. In refuting the defendant's claims of being ill, what else would the police testimony be but of a negative nature? If A says he has a leg off and B testifies, "I didn't see any leg off," this is what the Majority would call testimony of a negative nature, but would the Majority say that it was not a contradiction of the no-leg assertion? Perhaps it might not be, under the style of reasoning adopted in the Majority Opinion which, the more one reflects on it, as against the stark realities of the transcript, one cannot help but recommend it to lawyers as a conversation piece to discuss at bar association dinners when all other shop talk has dimmed into nocturnal innocuous lassitude.

It is an enigma to me how the Majority can say that the defendant's claim of illness was uncontradicted. Here is the testimony of the interrogating detective who was *there* :"Q. Now, between the time you first saw the defendant that morning and the time when he finished his statement in the afternoon, during that period did he ever tell you he was physically ill? A. No, he did not. Q. Now, you told Mr. Segal (defense attorney) that he told you he was ill. What did he say? A. The conversation relative to being ill is an incident about ulcers. Mr. Holton volunteered to me that he had ulcers. This fellow I worked with, Detective Mulhern, also suffers from ulcers."

Let us suppose that Holton did have an ulcer. This would not prevent him from telling the truth, would it? Some of the most honest and brainiest people in the country have ulcers. If all those who have ulcers were removed from the controls of responsible position,

24

the machinery of American civilization would grind to a screeching stop.*

Holton's ulcer could not have been particularly bad. Detective Mulhern, as above indicated, had an ulcer and he offered Holton a shot of Milanda, which the defendant imbibed and admitted that it eased his stomach. The trivial character of Holton's hypochondriacal ulcer became quite evident when he testified that, prior to his involvement in this crime, he had been to see a doctor and the doctor told him he *"might have an ulcer."* After that one visit to a doctor, Holton never went back. Nor did anyone ever suggest an X-ray picture of his mythical ulcer.

No one with an ulcer could have eaten and drunk what Holton ate and drank while he was in the supposed merciless, relentless clutches of the police, as suggested by the Majority Opinion. As soon as Holton arrived at the police station, he sat down to a meal of hamburger, coleslaw, potato salad, bread, butter and coffee. Ask ulcer patients how they would feel after that kind of a gastronomical mishmash churning in their abraded intestines! Not long after this hamburger-coleslaw special, Holton drank more coffee. Later the police took him to a cafeteria where he could order what he pleased. Still later this much-suffering defendant (in the maternally-solicitous eyes of the Majority) drank more coffee and then he was given a glass of wine which he downed with relish. What kind of cheating would ulcerated patients have to commit on their doctors to drink wine? What the Majority is trying to say in its Opinion, although it does not actually form the words, is that Holton was a victim of "police brutality." And, against that concept,

---

* At this point, the Trial Judge said: "So do a lot of other people, in case you don't know it. I might have one before this case is over."

I would register boundless protest. Even reading Holton's own account, one sees that he was treated with consideration, dignity and respect. The police gave him cigarettes, they allowed him maximum freedom of physical movement.

There is just simply no evidence in the record to establish that Holton was ill in the sense intended by the Majority, but even if, hypothetically, Holton did not feel as strong as a mountain climber and as healthy as Atlas and he did sense an occasional pain, this in no way would prove that he was incapable of speaking clearly, rationally, and reliably, or that he was not in the fullest possession of his faculties. Physical pain of itself does not impede the function of recollection, nor does it disturb factworthy narrative. A sprained ankle does not cripple truth nor does a bellyache knot the tongue. Indeed, the oral utterance which receives the highest rating of credibility in the courts is a dying declaration which is made during the most excruciating pains and agony to which the body and the human spirit can be subjected.

The Majority Opinion cites a number of cases in attempted bolstering of its Leaning Tower of Pisa of illogicality and imagination. I must confess that there are times when I become a little weary of citations which are wheeled into an Opinion like so many cannon to give the appearance of awesome muzzles ready to fire shells of devastating pertinence and then, when one examines the artillery pieces, one finds that they are made of irrelevant cardboard. Such are the jurisprudential field guns which the Majority gallops on to the battlefield of defending its defenceless decision. It cites, for instance, the case of *Davis v. North Carolina,* 384 U.S. 737, as authority for nullifying Holton's confession, on the basis that Holton's confession was coerced. In the *Davis v. North Carolina* case, the de-

fendant was held in a detention cell for 16 days where he spoke to no one but police who interrogated him intermittently each day. He was not advised of his right to remain silent, the atmosphere was "coercive." To compare the *Davis* case with the case at bar is like comparing a tiger with a mouse. At no time until Holton made his full confession was he held coercively. At no time until he voluntarily locked himself behind bars was he not free to leave at will.

Another one of the formidable howitzers the Majority wheels into position is the case of *Lynumn v. Illinois,* 372 U.S. 528. Here the defendant, a woman, was warned by police officers that if she did not "cooperate," she would be deprived of state financial aid for her dependent children and she might never see them again. I cannot imagine a heavier caliber weapon to put to a mother's head than a threat to deprive her of her children. The mother in the King Solomon story was willing to suffer any anguish rather than see her child halved. To compare the *Lynumn* case with the *Holton* case is like comparing a flying angel with a whirring bat.

The Majority then cites *Townsend v. Sain,* 372 U.S. 293. In that case the confession was obtained from the defendant while he was under the influence of drugs, including a "truth serum" administered by a police surgeon. Need I say that to compare *Townsend* with Holton is like comparing carbolic acid with soda pop?

And then there is *Reck v. Pate,* 367 U.S. 433, of which the Majority is so enamored that it cites it twice in its Opinion. In that case the defendant was held incommunicado for four days. He was ill, he was "faint and vomited blood on the floor." He was moved about in a wheel chair. He was not fed adequately. The Court held that the total combination

of circumstances "is so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect against whom its full coercive force is brought to bear."

How was Charles Holton coerced? This man who downed hamburgers and potato salad, waded in coffee and wine, and was free to leave at any time prior to his voluntary confession of his horrible crime.

The description by the Majority of the defendant's alleged physical ailments reads like the boring details of a valetudinarian who magnifies the slightest abrasion into malignant cancer, who looks upon a trivial cut as a threatened amputation and an after-drink hiccough as incontestable proof of double pneumonia.

The Majority Opinion sympathetically narrates that Holton said he was "getting the d.t.'s." There is not a word in all of Holton's fulsome self-pitying narrative to justify the use of so devastating a phrase as "D.T.'s." Delirium tremens is a disorder where the patient undergoes seizures which generally last from 3 to 6 days, and are characterized by terrifying hallucinations. There is not the slightest whisper of any such symptoms in the long detailed account Holton gave of his feelings during the time he was in the Police Administration Building.

Holton was a drinker and it is common knowledge that if one imbibes too much alcohol, he will have moments of distress, but that is far from saying that an occasional drinking spell will produce delirium tremens. Delirium tremens is more or less a species of insanity, and there is nothing in the record to suggest that Holton was mentally incompetent. In fact, a reading of his testimony on the witness stand shows that he was mentally keen.

Then the Majority, in a further excess of compassion, says that after "relentless questioning by several

police officers he finally agreed to admit anything they wanted him to in order 'to get out of the place for a while . . . and get some fresh air.' " Either the Majority Opinion writer has not read the transcript in this case or he has read it with a jaundiced eye. There was nothing "relentless" about the questioning. The discussion between the detectives and the defendant was entirely conversational, interspersed with coffee, cigarettes and numerous trips to the water fountain. And so far as fresh air is concerned, the defendant did not need to go out for fresh air. He was in an air-conditioned room! Moreover the defendant was free to go and come as he pleased and we have seen how the police kept plying him with food and drinks, taking him to the cafeteria, and so on.

Then the Majority attempts to make a ponderous hardship out of the fact that the defendant lay on the floor. Incidentally, the floor was carpeted wall-to-wall, and the defendant lay down at his own volition and not because he was forced to. Detective DeBenedetto testified: "He said to me is it all right if I lay on the floor? He said you have a rug on the floor. So I said, well, what's the matter with you? He said well, I feel tired. I said well, you are only going to be here a very short while. But, however, I said if you want to lay down, I said, go right ahead. And he laid there about 15 minutes."

The Majority Opinion is written in a rather strange fashion. For instance, it states at the very beginning that: "During the early morning hours of April 5, 1965, an unknown male surreptitiously entered the Philadelphia apartment of the girl's, then a senior medical student at Jefferson Medical College . . ."

The intruder may have been unknown at the time of the act but there can be no doubt today who the intruder was. A jury of twelve persons, after listening

to evidence for a week, proclaimed the intruder to be Charles Holton. Why does the Majority tergiversate here? Not only is there a judicial pronouncement that Holton *was* the intruder but Holton admitted himself he was the intruder. Why the tergiversation and equivocation?

And why does the Majority say that the intruder "surreptitiously entered" the house in which he had no right to be? "Surreptitiously entered" suggests that by stealth and artifice the intruder gained entrance through a tunnel or by concealing himself in a basket of laundry. Holton did not enter surreptitiously. He violently broke into the apartment of his victim. He described to Detective J. DeBenedetto how he was standing on Waverly Place, how he cut through some vacant houses and that when he got to the yard of 1419 South 10th Street, the house in which his victim lived, he was confronted with a fence 3 feet high, surmounted by barbed wire. He pushed down the barbed wire and then approached the fated house. He picked up a stone from the yard paving and hurled it against the window. He smashed the glass and then inserted his hand through the hole and unlatched the hasp. He crawled into the house and found himself in a kitchen. He reached into a box and pulled out a knife. He walked through what was apparently a dining room and then he saw a light on the floor above. He went up the stairs and entered a bedroom where he saw a woman lying in bed. Holton described how he sat on the edge of the bed with the knife in his hand. When the detective asked him what he did to the woman he replied he didn't remember. He did remember, however, taking the pillow slip and a revolver which he found between the bedspring and the mattress.

It is to be noted here that Holton did not say he did not rape the woman. He only said he didn't remember, this forgetfulness obviously being part of his plan to tell everything except the rape. He was not reluctant to give all the other details of the crime. He related how he carried away certain articles stolen from the house and hid them on an abandoned lot on Rodman Street. He offered to show the police where they were and he led the detectives to the lot. He explained that he had expected to retrieve the articles the morning after the burglary but, instead of getting up at 7, as he had intended, he overslept until 9:30, and when he got to the lot he saw a car pulling out. In addition, there were a number of children playing on the lot and he conjectured that somebody must have stolen what he had stolen.

The detectives asked Holton what he had worn the night of the crime and he described the garments. The detectives obtained a search warrant and went to Holton's home and found several items of wearing apparel belonging to Holton which were introduced at the trial.

Much of what the detectives testified, which tallied with truth, could not have been obtained except from the defendant, and the information and data could not have been obtained if the defendant had not been wholly mentally aware and entirely cognizant of the meaning of what he was saying.

The Majority Opinion says that Holton's story of being ill was not contradicted. Nonsense. I have shown that it was contradicted by the detectives, but I might say here that on the witness stand Holton at no time denied that he told the detectives what the detectives testified to. He said that the detectives made certain statements and he replied, "Yes, yes." But the detectives, as I have said, could not have

known the things they testified to without having gotten the information from the defendant.

The victim, who is now a medical doctor, testified that she was awakened during the night of April 5, 1965, and saw a man kneeling on her bed holding a kitchen knife to her throat. He ordered her to be quiet and continued to warn her not to awaken the other lady in the house. He continued these warnings with pressure of the knife to her throat. He ordered her to remove her intimate garment. She pleaded with him not to do what he obviously intended to do, and then he raped her. She testified: ". . . And then he—at the termination of this he leaned forward closer to me, and he kissed me quite violently, and I tasted the blood in my mouth. Q. Do you know whose blood that was? A. It was mine. I was cut."

When he got up from the bed she asked if she could go to the bathroom. She tried to reason with him, asking him to "think of his home and think of his family and the children and what this would mean to them. And this seemed to agitate him very much. . ."

She went to the bathroom and he followed her. He looked into the medicine chest to see what was there and she took advantage of this moment of nonsurveillance to dash out of the bedroom and take to the hallway hoping to get to the lower floor and escape. He caught her by the nightgown, hit her against wall and knocked her to the floor. As she lay on the floor, he straddled her and sat across her body. He then started to choke her. She testified: "I could feel my eyes starting to feel like they were popping out of my head. And my head was one big roaring, everything was turning black. Even the light overhead was beginning just to turn black.

"And I raised my right hand and blessed myself, made the sign of the cross, because I was sure that there was no way out of this. And just at that, as

soon as I did that, he released his hold on my throat for which I am grateful. And then I believe he grabbed me by my arm, and my hair and threw me back in the bed."

He now struck her in the face with his clenched fist, repeatedly. He then thrust a cloth into her mouth and applied adhesive tape over her lips. He then ripped loose the extension cord that ran to the light of her bed, "and wrapped it very, very tightly around my wrists, both wrists together. Then around my neck, and then he dragged my knees up and put it around my knees also so I was all, completely doubled up."

After this he removed her underwear and took obscene liberties with her person. He then struck her two or three times over the head with a shoe and left. She described what followed: "And I was trying to think of ways to get out of this mess, I threw myself from the bed to the floor. I was able to loosen the adhesive tape. It was paper-backed adhesive tape. It doesn't stick too fast. So I was able to just somehow or other, I got the tape off my mouth. And I thought if I could throw myself to the floor, possibly I could inch my way to the telephone or to some object that I could untie myself, because I was very uncomfortable. I tried to—well, I got on the floor, I saw it was to no avail. I just couldn't move that much. And I tried to—I thought I could chew the extension cord. My hands were close by my mouth. My wrists were close enough. I thought maybe I could at least bite through the insulation so that my hands wouldn't be so painful. However, my jaws wouldn't go together. My teeth wouldn't go together since my jaw was broken.

"So I lay on the floor, and I had to keep my head in just one certain position in order to breathe, be-

cause my throat was swollen probably from having been choked. And the cord around my neck was very, very tight, and I was having trouble getting my breath. I couldn't swallow.

"And I lay there for a very, very long time. And finally it was daylight. And I had heard a couple of trucks go by, and I tried to scream out to them, what I assumed were trucks, but nobody heard me. And I was wondering how long it took, just how long does it take to die."

She now began to scream. At about 7:20 a.m., the police and a medical student arrived. Police Officer Polizzi testified to what he found: "At that time Officer Coretta arrived. Him and I went up the steps together to the second floor front bedroom. As I entered the bedroom, I observed complainant sitting on the floor tied. She was in such a position tied that she could—that she couldn't lower her knees. Her knees were to her chin. This electrical cord was wrapped around her neck. Her wrists, her hands were black. And the left side of her face—

"THE WITNESS: Her left eye was swollen to the extent that it was closed. Her left side of her face from her forehead down to her chin was out about an inch, two inches, extended, swollen. She was part—she couldn't hardly talk. She said, 'Get me a glass of water.' "

What caused the police to take Holton into custody? An informer, the identity of whom the police did not divulge, indicated to the police that Holton was involved. The informer could have been an acquaintance of Holton to whom Holton had boasted of his libidinous enterprise. But it is immaterial what may have been the source of the informer's information or his motives. The police were certainly required, in the conscientious fulfillment of their duties of investi-

gation of a horrible crime, to follow up every clue. They approached Holton and he did not object to getting into the car with them and proceeding to the police administration building.

While there, Holton was not abused in any way. He was not beaten, he was not threatened, he was not offered any leniency in punishment if he confessed, he was not persuaded into speaking. The statement by the Majority Opinion that the defendant was "relentlessly" questioned can only be characterized as stuff and nonsense. Even the defendant did not say he was relentlessly questioned. "Relentless questioning" suggests a browbeating, badgering, domineering, menacing, dictatorial interrogation with the interrogatees not being allowed to explain. It was Holton himself who first got into the specifics of the crime of April 5th when he spontaneously declared: "Look, I broke into that house, but I don't remember raping that girl."

There is nothing in the transcript to suggest in the remotest manner that the police were seeking anything other than the truth. The Majority Opinion admits that Holton was given the most ample warning, namely, "Now I have to advise you anything you say is going to be used either for or against you. Now you don't have a lawyer, so you still don't have to make a statement. But if you want a lawyer you will either get one at a hearing tomorrow morning . . . If you care not to make a statement now, don't make it."

Even after this ample warning, the police did not immediately question Holton. They took him to the cafeteria for coffee and then they all returned to the "interview room", where he later admitted his guilt. All this the Majority concedes, but, then, in a non sequitur that baffles, confounds and mystifies, states that somehow Holton was victimized by the police.

The Majority's statement that Holton was too sick to be questioned is absurd on its face. The record

shows what he did on the night of April 5th when he was not too sick to break into a house, overpower a woman, ravish her, bind her up with wire like a bale of hay, beat her up like a medieval flagellator, gather up loot in the house, and leave. There is no evidence what he did on April 6th, but the record is complete of his actions on April 7th. He wasn't so sick that he had to remain in bed that day. He was standing on the street conversing with acquaintances and carrying on in the normal fashion of a healthy person. Invited into a police car, he went willingly, and we have seen how he conducted himself at the Police Administration Building. His appetite was elephantine and his thirst was camel-like. The Majority sets great store by the fact that he sweated. His enormous intake of liquids would suggest that the perspiration glands had to help out on the outtake.

After he voluntarily described what he had done on the night of April 5th, he voluntarily offered to take the police to the lot on Rodman Street. He had no difficulty getting in and out of the automobile on this search, or on the other trips. He obtained an attorney who presumably discussed with him at length the details of his case and on the next day we find him at a magistrate's hearing not sick, not lying on the floor, not complaining about his fantastic ulcer, but a standing participant in the proceedings. Here we have four continuous days of uninhibited physical activity on the part of the defendant, and yet the Majority would now have the world believe that for the few moments that he described what he had done on April 5th, he was too sick to talk.

Holton voluntarily admitted practically every detail of his crime except the actual carnal attack of his victim, and he did not deny her accusation in its humiliating and painful detail. The furthest he went in denial was to say he did not remember raping her.

In the light of this voluminous record of Holton's physical activity and spontaneous utterances, how can the Majority say with a straight face that Holton was incapable of speaking willingly, untrammeledly, and uncoercedly? What reasons does the Majority assign in support of its conclusions of Holton's incapacity? The Majority enumerates those reasons and, among them, it lists the following blatant, inane, preposterous propositions, namely, Holton drank a great deal of water, he took an antacid pill during the questioning, he lay on the floor for a few minutes *after* he had admitted his crime, he drank a glass of wine. If these reasons were given by a tobacco-chewing, cracker barrel, illiterate expositor as explanation for physical and mental incapacitation, one would dismiss the exposition as drivel. It may become educated drivel when it comes from a Court, but that does not change its essential nonsensical fatuity.

Then the Majority Opinion says that a consulting psychiatrist described Holton as being "exceptionally anxious, nervous, overwrought, gave indications of being somewhat agitated." Does that make him any less responsible for what he said and did? It is not strange to learn that he was nervous and agitated. That's the kind of person Holton probably is. We will recall that the victim testified that during the perpetration of his unspeakable deed he was "agitated." The wolf that kills a sheep is agitated when he sinks his teeth into the neck of his prey, and he undoubtedly is even more agitated when the shepherd or farmer blasts away at him with a shotgun.

To say that Holton, a proved, confessed rapist, should be excused from punishment for his horrendous crime because he was agitated is outrageous claptrap. Anyhow, the psychiatrist who made the above statement did not see Holton until two days *after* he had

confessed. By this time Holton was probably fully realizing that the strains of the fiddler's music had died away but that he still had to pay for dancing on the body of his helpless victim. He had plenty to be agitated about.

In addition to everything I have said up to this point I find fault with the decision of the Majority because it overrules a solemn finding of fact by the constitutional fact-finders, the jury, on this very issue of the alleged sickness of the defendant. The jury saw the defendant, the prosecuting witness, the police and all other witnesses. The Majority of this Court saw none of these witnesses. Now, by a glance at the record, how profound a glance I do not know, the Majority upsets this finding of twelve conscientious citizens sworn to do their duty, who heard evidence for eight days.

In addition, and this is no small matter, this whole issue of the voluntariness of the confession and the alleged sickness of the defendant was passed on, in a separate hearing, by one of the ablest, most venerable and reliable jurists in the Commonwealth, Judge CHARLES WATERS. Defendant's counsel, after the defendant had confessed, filed a motion to suppress the confession, and this motion came before Judge WATERS, for a full scale hearing, where the defendant, the detectives and all other pertinent witnesses on the subject of confession were heard. Among those witnesses was Dr. Berk, the man the Majority quotes on Holton's condition, the man who, as above indicated, did not see the defendant until two days after his confession. After a full scale hearing, where he saw Dr. Berk and all the witnesses, whom the Majority of course never saw, Judge WATERS found in a solemn adjudication that Holton had made his confession voluntarily and under none of the alleged handicaps which

the Majority bases its ill-founded decision upon. Thus the majority of this Court overrules the findings of twelve jurors and two able, distinguished judges by a course of reasoning which, I say with all respect, would flunk in logic a high school sophomore.

During recent years I have been criticizing some of the decisions of the Supreme Court of the United States. So, also, our Chief Justice, JOHN C. BELL, JR., has not been reluctant to express his disapproval of some of the pronouncements of the high court which have released confessed murderers, rapists, burglars, subversives, traitors and spies, endangering the safety of the people and jeopardizing the very security of the nation, on technicalities so flimsy that gossamer, in comparison, could be regarded as armor plate. Everything I have said about the Supreme Court of the United States in criticizing its decisions which freed proved violent criminals, I incorporate into this Dissenting Opinion, by reference, as comment on the decision of the Majority in this case.

What the Majority has pronounced here is not only bad law but it inflicts a horrendous injustice on the victim of the crime involved. It demands that she undergo the renewed ordeal of reliving the horrors of the night of April 5th when she was robbed of her virtue, subjected to the tortures of the damned and brought within an inch of death itself.

Moreover, it must be apparent to the Majority that the chances of convicting Holton on evidence which excludes his confession will be meager, so that very probably another confessed rapist will be released to break into homes at night, to assault and possibly murder people in their beds.

What the Majority is doing here is not only freeing one of the most dangerous characters (as proved by the record) in Philadelphia, but in effect it will also be

freeing others who commit similar acts of barbarism. There is not a rapist or murderer who cannot, after he has confessed to a revolting crime, state that when he confessed he was thirsty, that he consumed hamburger, coleslaw, potato salad, bread, butter, coffee and wine, that he lay in a carpeted, air-conditioned room and that all this made him ill and so incapacitated him that everything he voluntarily said cannot be used against him. And, according to this Court's decision, no evidence forthcoming from honest, conscientious policemen who had the man under their eyes for hours, can overcome the naked assertion of the criminal and that, therefore, the outlaw barbarian must be returned to his cave, dive, and criminal haunts to plan to rob, assault and destroy other innocent people. If this is law, then I can hear heavy rumblings in the cemeteries of the world of the mass turning in their graves of Moses, Justinian, Blackstone, Coke, Littleton, Kent, Marshall and the other lawgivers and law interpreters who have striven to make jurisprudence the science of justice, and not the chessboard of amateur dialecticians. The decision in this case offers guide-lines to confessed convicted criminals on how to upset jury verdicts. In comparison to this decision, *Miranda* is a Gibraltar of safety for society!

As I write this Opinion, I am shocked by the news account of a young school teacher, Alice Hayes, who was stabbed to death by a marauder who broke into her apartment in Philadelphia and escaped. An editorial in the Philadelphia *Inquirer*, commenting on this tragedy, says: "Police immediately spotted two unwritten errors made by Alice: her full name on the lobby mailbox advertised her as a woman living alone; marks on her door showed it had been pried open, but the night latch was undisturbed suggesting it had not been used."

Thus, the flood of violence sweeping the nation has reached such a highwater mark that young women may not even use their full names because to do so may invite the criminal assaults of prowling rapists and murderers. A columnist on the Inquirer, Hubert Stewart, visited the neighborhood where Miss Hayes was slaughtered and quoted the statement from a woman who said: "This kind of thing happens all the time in Philadelphia." And then Mr. Stewart went on: "A glance through the day's newspapers did not discourage her view: A 23-year-old woman is found bound and raped in the hallway of a house on Angora Terrace near 53d St . . . A Temple coed is abducted at knifepoint near her Society Hill residence and raped . . . A young school teacher is knifed on the neck and hands when she fights off an attacker in her apartment on 21st St. near Cherry . . . A 19-year-old girl is assaulted under the Penn Central overpass at the Wayne station . . . A 39-year-old nurse is beaten and robbed in her apartment on Addison St. near 8th."

It is always difficult and sometimes practically impossible to obtain clues on the identity of these monsters, and thus they go undetected, and are free to attack other women. Occasionally, the identity of the rapist is ascertained and he voluntarily confesses to his hideous crime. He is tried and convicted and then a court rules that since he had a bellyache when he was talking, eating, drinking, and smoking cigarettes, he is entitled to a new trial.

There is another account in today's newspapers of a man who was tried and convicted of rape, and the court ordered a new trial because of some alleged trial error. He was released on bail and while at large was arrested in connection with the attempted rape of another woman.

I suppose that after this Court's decision in the instant case, Holton will be at large on bail. In this respect I at least have the consolation that if Holton commits another rape I will not have been a party to his ridiculous release.

But I am not finished with my observations on the Majority Opinion. As if it did not say enough in violation of common sense, it went on at the end to place an impious frosting on its casuistic cake. It declared that the Trial Court was in error when it called upon God to aid the jury in reaching its verdict. I was afraid it would come to this. It is becoming the fashion to make light of religious invocation. Books are being published asking whether God is dead. Well, God is not dead, and judges who criticize the invocation of Divine Assistance had better begin preparing a brief to use when they stand themselves at the Eternal Bar of Justice on Judgment Day.

Each of our Presidents, from George Washington to Lyndon B. Johnson, has, upon assuming his office, asked the protection and help of God. Since 1865 the words "In God We Trust" have been imposed on our coins. The Star Spangled Banner, made our National Anthem by Act of Congress, contains the couplet:

"Then conquer we must, when our cause it is just,

And this be our motto 'In God is our Trust.' "

The Pledge of Allegiance declares our nation to be: "One Nation, under God, indivisible, with liberty and justice for all." The signers of the Declaration of Independence avowed their "firm Reliance on the Protection of Divine Providence."

Our country is made up of a religious people. Yet the U. S. Circuit Court of Appeals (Illinois)* declared

---

* *DeSpain v. DeKalb County Community School District*, 384 F. 2d 836.

unconstitutional a verse recited by kindergarten children, as follows:

"We thank you for the flowers so sweet;
We thank you for the food we eat;
We thank you for the birds that sing;
We thank you for everything."

Although there is no mention of the Deity in these beautiful lines of thanksgiving, the Court argued that the rendition of the verse was unconstitutional because when the children spoke the word "you," they were thinking of God. Have we now reached the point that it is illegal even to think of God? What kind of reasoning would cause a judge to outlaw the concept of God, when the Supreme Being is acknowledged by the Courts at the opening of each day's session of Court?

Each morning when our Court convenes, we stand, as the Court crier intones: "God save the United States and this honorable Court." Does the Majority of this Court believe that it is all right to pray for the judges but not for the juries? I'll concede that the judges need prayer more! Certainly some judges, at least.

When I presided over trials in the Criminal Court of Allegheny County I often invoked the blessings of the Deity in charging juries. I trust I do not seem egotistical when I say that one charge I delivered has been cited on occasion as a model charge in murder cases. I said in that charge (delivered December 11, 1940): "Members of the jury, as the judge charged with the responsibility of presiding over this trial I have given you the instructions required by law, but there is a Judge who presides over all of us whom you should heed in this case as in every decision you must make in your life. When you retire to the jury room, call on the Supreme Judge of all creation to fill your minds with wisdom and your hearts with justice so that you will return a verdict with which you will be

satisfied not only at the moment of its rendition, but one which you will be pleased to submit for review when you appear before the Greatest Court of all on the Last Great Day." (*Commonwealth v. Drago,* 88 P.L.J. 647.)

The Majority says that the instructions given by Judge GRIFFITHS when called upon for instruction were "improper" because he told the jury that they should decide the case on their consciences. He particularly stated: "I'm not telling you what kind of verdict to bring in," and he then added, "but I'm telling you to stand up like men and women and do what you should do before your God to whom you will answer some day whether you answer to this court or not."

What was wrong with that? If the jury believed Charles Holton was innocent, they might still have hesitated to return a verdict of Not Guilty because of the excessive brutality of the crime. The Judge told them in effect not to be afraid to return a verdict of Not Guilty if they believed him innocent and not to be afraid to return a verdict of Guilty if they believed him Guilty. What was wrong with that?

The Majority says that what Judge GRIFFITHS said in that supplemental charge was a "sin." This indeed is the concluding straw and the camel may as well immediately repair to a veterinarian for repair to a broken back. I, myself, see no sin in what Judge GRIFFITHS said and, on the contrary, laud him on his reverent and courageous utterance. I am perfectly willing to take my chances with him at the gates of Saint Peter and answer on our voir dire that we were always willing to invoke the name of the Lord in seeking counsel in rendering a grave decision on earth, which I believe the one in this case to be.

*Miserere nobis Omnipotens Deus!*