450 A.2d 145

**COMMONWEALTH of Pennsylvania**

v.

**Donald L. GLENN, Appellant.**

Superior Court of Pennsylvania.

Submitted Oct. 5, 1981.

Filed Sept. 10, 1982.

Petition for Allowance of Appeal
Denied Jan. 20, 1983.

Mark E. Kogan, Philadelphia, for appellant.

Jane C. Greenspan, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before WICKERSHAM, McEWEN and POPOVICH, JJ.

McEWEN, Judge:

We here consider a direct appeal from the judgment of sentence following a jury trial in which appellant was convicted of three counts of robbery, rape, burglary and crimi-

nal conspiracy for which appellant was sentenced to serve a term of imprisonment of from twenty to forty years. We affirm.

The brief of the Commonwealth accurately summarizes the events upon which the convictions of appellant are based:

> The instant case arises from an attack on three University of Pennsylvania students by three armed intruders, during which the victims' apartment was plundered and their goods were stolen. One student was raped, while the other two were bound and gagged, helpless to interfere. The Commonwealth's evidence established the following. On February 25, 1979, at about 5:00 p. m., Perry Sobel and Marian Sussman were entering the apartment building at 4300 Spruce Street in Philadelphia (N.T. 112). Mr. Sobel lived there with two other roommates and Ms. Sussman was visiting them that evening. As Mr. Sobel prepared to put his key in his door, he and Ms. Sussman were approached from behind by three black males who, after a brief inquiry, grabbed Mr. Sobel by a chain around his neck, put a gun to his head and forced both him and Ms. Sussman into the lobby of the building (N.T. 112–113, 150–151). They demanded to be taken to Sobel's apartment where they were let in. One of Sobel's roommates, Neil Unger, was at home. When he heard the door open, he left his room and entered the apartment's hallway. However, Unger was immediately confronted by a gunman who forced him to aboutface (N.T. 118). Unger, Sobel and Sussman were then led to the bathroom and forced to lie down on the floor (N.T. 118). At all times, they were instructed not to turn around and the intruders took precautions to preclude any subsequent identification by placing bandaids and masking tape placed over the victims' eyes (N.T. 118, 119, 152, 164). Marian Sussman was then dragged from the bathroom, placed in a nearby bedroom, undressed, and raped consecutively by two of the robbers. Meanwhile, both Sobel and Unger could hear her cries and pleas but were powerless to come to her aid

(N.T. 120, 165–166). The robbers took their victims' wallets, money, any checks and valuables found around the apartment and then began to ransack and empty the premises. By this time, Marian Sussman, still naked, had been shoved back into the bathroom and all three victims were tied together with wire from the telephone which had been pulled out of the wall (N.T. 121, 135, 155). For approximately forty (40) minutes or more, the three students could hear the sounds of the apartment being dismantled. Nearly everything of value was taken including the stereo system, numerous items of clothing, appliances, cameras, jewelry and watches (N.T. 129, 154, 171). Finally, the men demanded the keys to Sobel's car, ascertained its location and sent one of their number to get it. When he returned, the loot was loaded into the car and the assailants fled, leaving Sobel and Unger and Sussman still bound together (N.T. 123, 124, 155, 168–169). After several minutes, the three managed to untie themselves and Unger found an operable phone in a friend's apartment and called the police (N.T. 169). At approximately the same time, defendant and co-defendant, Joseph Woolfolk, were observed driving Sobel's car, which was loaded with the items stolen from the rape/robbery, and were apprehended. (Brief of Appellee at pp. 2–4)

The brief of appellant presents the following Statement of Questions Involved:

1. Did the learned trial court err in denying appellant's motion to suppress all physical evidence?

2. Was the evidence sufficient as a matter of law to sustain appellant's conviction for rape?

3. Did the court commit a reversible error entitling appellant to a new trial when it admitted over objection the report of a seminal stain on appellant's underwear?

We have carefully reviewed the briefs of the parties, as well as the entire record, and conclude that the distinguished Judge Joseph P. Braig provided for a proper determination of the case and has done so in such able fashion that we need only discuss the initial question. Appellant there contends

that since there was no probable cause for his arrest, the arrest was unlawful and the evidence seized in that arrest became thereby inadmissible. We do not agree.

■ The record reflects that Officer Alexander Schulke testified at the suppression hearing that before arresting the appellant, he and his partner, Officer Michael Ziegler, saw the silver Mercury Cougar in which the appellant was a passenger, make an illegal lefthand turn through a red light. The police officers followed in their vehicle. When the car failed to stop for a stop sign at the next intersection, the officers signaled the vehicle to halt with the patrol car's dome light and spotlight. The accomplice of appellant pulled the car to the curb and appeared to have stopped the vehicle, but when the patrol car stopped, the accomplice immediately sped away and went through another stop sign at the next intersection. The police continued to pursue the vehicle for several blocks until it hit the curb and came to a complete stop when the accomplice failed to negotiate a right turn. Joseph Woolfolk, the accomplice of appellant and operator of the vehicle, stepped out of the car and took several steps toward the police car, concealing his hand in his coat; after exiting the patrol car, Officer Schulke drew his gun fearing that Woolfolk was armed. Woolfolk suddenly spun around and fled with Officer Ziegler in pursuit. When Woolfolk made a motion as he ran down the street as if he were going to fire a gun, the police officer jumped between two cars. Woolfolk then fled the scene successfully and was observed discarding various items of clothing as he did so.

Meanwhile appellant, seated in the passenger seat and in the presence of Officer Schulke, had opened his door in an attempt to leave the car but was unable to do so since the antenna from a large portable television set which was on his lap had become entangled with the dashboard, effectively pinning him to his seat. Officer Schulke, his gun drawn and pointed in the direction of appellant, repeatedly ordered him to remain still. Appellant, despite these orders, continued to move about and reached behind the seat with his left

hand to the rear of the car—where a gun was later recovered. As a result of the resistance of appellant, Officer Schulke called for the assistance of his partner and appellant was, thereafter, forcibly removed from the car.

As Officer Schulke approached the passenger side of the car and while removing defendant from the vehicle, he observed a highly suspicious assortment of goods in the rear seat of the vehicle which included such items as stereo speakers, suitcases and a number of bags, some of which contained the names of Unger and Sobel as well as out-of-state addresses.

After defendant was removed from the car the officers patted him down and discovered a wallet, wires and a can opener in the pocket of his coat. Although appellant had previously identified himself to police as Joseph Williams, the name on the license in the wallet was Perry Sobel. Appellant tried to explain the discrepancy by saying that the wallet belonged to the operator of the car.

Some minutes later Woolfolk, the driver of the car reappeared on the scene acting as though he were a spectator. Both police officers immediately recognized him despite his attempt to conceal his identity by the removal of some of the clothes he wore at the time he fled. Both appellant and Woolfolk were then transferred to police headquarters where the officers learned of their connection with the instant crimes. A full scale search of the vehicle at the police station revealed the loot from the robbery committed at the Spruce Street apartment.

In *Commonwealth v. Allen,* 287 Pa.Super. 88, 429 A.2d 1113 (1981) we set forth the standards applicable to an arrest based upon probable cause:

A legal arrest without a warrant depends upon probable cause. *Commonwealth v. Pinney,* 474 Pa. 210, 378 A.2d 293 (1977); *Commonwealth v. Bishop,* 425 Pa. 175, 228 A.2d 661 (1967), *cert. denied,* 389 U.S. 875, 88 S.Ct. 168, 19 L.Ed.2d 159 (1967). Probable cause exists if the facts and circumstances which are within the knowledge of the police at the time of arrest, and of which they have

reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that a suspect has committed or is committing a crime. *Commonwealth v. Powers,* 484 Pa. 198, 398 A.2d 1013 (1979); *Commonwealth v. Culmer,* 463 Pa. 189, 195, 344 A.2d 487, 490 (1975); *Commonwealth v. Jones,* 457 Pa. 423, 428, 322 A.2d 119, 123 (1974); *Commonwealth v. Garvin,* 448 Pa. 258, 262, 293 A.2d 33, 35–36 (1972); *Commonwealth v. Holton,* 432 Pa. 11, 14–15, 247 A.2d 228, 230 (1968). The standard of probable cause, however, must be applied to the totality of the circumstances facing the police. Facts insufficient to justify an arrest if considered separately may in combination supply probable cause. *Commonwealth v. Roscioli,* 240 Pa.Super. 135, 138, 361 A.2d 834, 836 (1976). In *Commonwealth v. Tolbert,* 235 Pa.Super. 227, at p. 230, 341 A.2d 198 at p. 200 (1975), this court said 'When we examine a particular situation to determine if probable cause exists, we consider all factors and their total effect, and do not concentrate on each individual element . . . . We also focus on the circumstances as seen through the eyes of the trained officer, and do not view the situation as an average citizen might . . . Finally, we must remember that in dealing with questions of probable cause, we are *not* dealing with certainties. We are dealing with the factual and practical considerations of everyday life on which reasonable and prudent men act. This is not the same 'beyond-a-reasonable-doubt' standard which we apply in determining guilt or innocence at trial. *Commonwealth v. Devlin,* 221 Pa.Super. 175, 289 A.2d 237 (1972).

*Id.,* 287 Pa.Superior Ct. at 102, 429 A.2d at 1119–1120 (quoting *Commonwealth v. Kazior,* 269 Pa.Super. 518, 523–25, 410 A.2d 822, 824–25 (1979), *allocatur denied* (1980)).

When we apply these principles to the instant facts, it is clear that the police officers had probable cause to arrest appellant. The officers were faced with the following circumstances: (1) the vehicle in which appellant was riding committed several traffic violations; (2) the vehicle did not

stop when signaled by police officers; (3) it thereafter attempted to elude the officers; (4) once the car finally was stopped after it ran into a street curb, the operator, appellant's accomplice, fled on foot while shedding clothes and making movements as though armed; (5) defendant also made efforts to escape which were thwarted by the entanglement of the television with the dashboard; (6) appellant made furtive movements and reached into the back seat of the car in defiance of the police order for him to remain still; (7) as the officers approached the vehicle to remove appellant, they noticed a suspicious assortment of goods including the T.V. on appellant's lap, stereo speakers, stereo components, suitcases and numerous bags labeled with different names and out-of-state addresses which, under the circumstances, a trained police officer would suspect were stolen goods.

We conclude that, under all of these circumstances, the officers had probable cause to arrest appellant at the time they removed him from the automobile. The totality of circumstances faced by the officers provided a sufficient and justifiable basis for a conclusion that some crime had been or was being committed by the occupants of the vehicle. Indeed, "the police officers would have had to shut their minds to a number of circumstances which indicated criminal activity to avoid making an arrest. This [a reviewing court] will not ask them to do." *Commonwealth v. DeFleminque,* 450 Pa. 163, 166, 299 A.2d 246, 248 (1973).

■ We reject the assertion of appellant that the *Terry* standards applicable to an investigatory stop and frisk are relevant to our determination. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Appellant contends that the wallet seized by police from his coat pocket following his removal from the vehicle should have been suppressed since the examination of its contents exceeded the authority of the police in an investigatory stop and frisk. This contention is specious. It is clear that probable cause to arrest appellant ripened on the basis of the totality of the above mentioned circumstances even before the officers

frisked him and retrieved and examined the wallet belonging to one of the victims. Since the argument challenging the validity of his arrest on the basis of probable cause fails, so too does his argument that the evidence seized from the vehicle should be suppressed on the grounds that it was fruit of the primary illegality. Therefore, we conclude that the Common Pleas Court properly denied the motion to suppress the items seized as a result of the arrest.

Judgment of sentence affirmed.