Commonwealth *v.* Kirkland, Appellant.

Argued October 9, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Albert Martin,* with him *Joseph C. Recht,* for appellant.

*William Claney Smith,* Assistant District Attorney, with him *George H. Ross,* Assistant District Attorney, and *Edward C. Boyle,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. CHIEF JUSTICE BELL, November 27, 1963:

Defendant-appellant (Catherine Kirkland) was tried upon an indictment containing two counts: (1) murder and (2) voluntary manslaughter. Following her general plea of guilty, the case was heard by Judge McKENNA without a jury. He found her guilty of murder in the second degree and sentenced her to imprisonment for not less than four and not more than eight years. This appeal followed. Only two ques-

tions are raised, but both of them are very important.

Before the trial, the assistant district attorney informed counsel for defendant that in his opinion the evidence would not warrant a verdict of murder but only a verdict of voluntary manslaughter. He also informed her counsel that if defendant pleaded guilty to the indictment generally, he would recommend to the Court, *upon the conclusion of the presentation of the Commonwealth's evidence,* a dismissal of the murder count and an imposition of sentence only on the count of voluntary manslaughter.

All the attorneys then conferred with Judge Mc-Kenna. When informed by the assistant district attorney of the recommendations he planned to make at the conclusion of the Commonwealth's evidence, provided the appellant pleaded guilty to the indictment generally, Judge McKenna told them that until he had heard the Commonwealth's evidence, he would not make any commitment as to the degree of guilt which would be found. According to the brief of the defendant's experienced counsel, Judge McKenna said, "He respected the opinion of Mr. Ross but on a plea of guilty generally to the indictment, he would base his verdict on the testimony produced in the case."

When defendant was thereafter arraigned, her counsel advised the Court that she desired to plead guilty generally to the indictment. The Court thereupon catechized defendant to make certain that she clearly understood the gravity, the effect and the consequences of this plea. After the Court was satisfied that defendant—not only through advice of her counsel but also—*personally* understood the effect and possible consequences of what she was doing in pleading guilty, her plea of guilty was accepted and recorded.

After almost all of the Commonwealth's evidence had been presented, Judge McKenna informed counsel for both sides that he believed from the evidence

thus far heard that defendant's crime was second degree murder. The assistant district attorney expressed disagreement and respectfully repeated his opinion that the evidence would not support a finding of guilt other than of voluntary manslaughter. Defendant then asked leave to withdraw her general plea of guilty, so that the issue of the degree of her guilt could be submitted to the jury. The Court refused the application or motion.

At the conclusion of the Commonwealth's case the assistant district attorney again repeated the recommendation which he had promised to make, and the Court again declined to allow defendant to withdraw her plea of guilty.

Defendant now contends that by reason of such refusal by the Court, she has been deprived of her Constitutional right to a trial by jury. We shall discuss not only her Constitutional rights but also her statutory right to withdraw her plea under the Act of April 15, 1907, P. L. 62, as amended by the Act of June 15, 1939, P. L. 400, 19 P.S. §241.

Defendant contends that it was an abuse of discretion for Judge McKENNA to refuse to permit her to withdraw her guilty plea after hearing most of the Commonwealth's evidence; and that "This constitutional right [to a trial by jury] was [mistakenly] *waived* by the appellant on the advice of her counsel." Defendant's counsel were competent lawyers, experienced in the trial of homicide cases. The basis for this contention of "mistake" is that she relied on the advice of her counsel that:

"(a) The Court would determine her guilt under the law and all the evidence.

"(b) The district attorney would recommend a finding of voluntary manslaughter.

"(c) The Court ordinarily followed such recommendation, and

"(d) Leniency was ordinarily extended to individuals of her age, extreme poor physical condition, and previous good character and reputation."

. The Constitution of the United States provides, in Article III, Section 2(3), "The Trial of all Crimes, except in Cases of Impeachment, shall be by jury; . . . ."

The Sixth Amendment of the Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy public trial, by an impartial jury of the State and district wherein the crime shall have been committed, . . . ."

. The Fourteenth Amendment provides, in Section 1: ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; . . . ."

The Constitution of Pennsylvania provides, in Article I, §6, "Trial by jury shall be as heretofore, and the right thereof remain inviolate."

. Article I, §9, provides, "In all criminal prosecutions the accused hath a right to . . . a speedy public trial by an impartial jury of the vicinage; . . . nor can he be deprived of his life, liberty or property unless by the judgment of his peers or the law of the land."

It is well settled that the right to a trial by jury may be waived—if waived understandingly and in writing—by a person accused of all crimes except murder and treason. In indictments for murder, defendant, with the consent or approval of his attorney of record, may plead guilty, in which event the crime and the degree of the crime are determined and fixed by a Judge or by a Court without a jury:* Act of June 11, 1935, P. L. 319, 19 P.S. §786; *Commonwealth v. Petrillo,* 340 Pa. 33, 16 A. 2d 50; *Commonwealth ex rel. Wilson v. Banmiller,* 393 Pa. 530, 533, 143 A. 2d 657; *Commonwealth v. Cole,* 384 Pa. 40, 119 A. 2d 253; *Hallinger v. Davis,* 146 U.S. 314; *Palko v. Connecticut,* 302 U.S.

---

* In Philadelphia and in Pittsburgh more than 95% of all criminal cases are tried by a Judge without a jury.

319, 324; *Frank v. Mangum*, 237 U.S. 309, 341. Indeed, in the *Palko* and the *Frank* cases, the Court held that a State *may*, without infringing the Fourteenth Amendment, *abolish* trial by jury. Cf. also, *Fay v. Noia*, 372 U.S. 391; *Gideon v. Wainwright*, 372 U.S. 335; *Johnson v. Zerbst*, 304 U.S. 458.

Section 1 of the Act of April 15, 1907, as amended by the Act of June 15, 1939, supra, pertinently provides "That the defendant *may**  withdraw his plea of guilty, at any time before sentence, by leave of the court." This proviso has always been construed as vesting the trial Judge *with discretion to allow or deny* the withdrawal of a guilty plea, subject to review on appeal and *reversal only in the case of a clear abuse of discretion: Commonwealth ex rel. O'Niel v. Ashe*, 337 Pa. 230, 10 A. 2d 404; *Commonwealth v. Senauskas*, 326 Pa. 69, 191 A. 167; *Commonwealth v. Shawell*, 325 Pa. 497, 191 A. 17; *Commonwealth v. Cole*, 384 Pa., supra; *Commonwealth v. Stevenson*, 198 Pa. Superior Ct. 55, 61, 181 A. 2d 910, 913; *Commonwealth v. Todd*, 186 Pa. Superior Ct. 272, 142 A. 2d 174;**  *Commonwealth v. Sablowsky*, 150 Pa. Superior Ct. 231, 235, 27 A. 2d 443; *Commonwealth v. DiPaul*, 122 Pa. Superior Ct. 53, 184 Atl. 480.** 

In *Commonwealth v. Senauskas*, 326 Pa., supra, the Court aptly said (pages 71-72, 73) : "It may be stated generally that for a judge to make a bargain, engagement or promise in advance of the hearing of a case irrespective of what the evidence might thereafter show the facts to be and as to what judgment he should render therein, *would be judicial misconduct*. Such agreements have uniformly been held to have no binding effect, and they are incompatible with the powers or duties of a judicial officer. The failure of a judge,

---

* Italics throughout, ours.

** In these cases many of the circumstances which would permit the conclusion of abuse of discretion are enumerated.

who enters into an agreement of this type, to comply with his promise gives to the defendant the right to withdraw his plea of guilty and enter a plea of not guilty, under the theory that the plea of guilty is not binding upon a defendant when induced by fear, promises, [improper] persuasion or ignorance. Indeed a confession made under such circumstances would not be received as evidence.

. . .

"*To avoid possible imposition on the courts* by petitions of the character now before us, . . . allegations of such [judicial] misconduct should be *clearly* proved to warrant the fastening of discredit upon any judicial officer. . . .

"Counsel for the defendant advanced the further argument that the withdrawal of the plea of guilty should be permitted regardless of any promise. The granting of an application for leave to withdraw a plea is a matter of judicial discretion: Commonwealth v. Di Paul, 122 Pa. Superior Ct. 53. The reason assigned here, that counsel believed there was an understanding with the court, is not sufficient to permit the withdrawal, especially since the hearing judge has found that no such promise existed . . . ."

To support her contention of abuse of discretion, appellant relies on certain statements from Corpus Juris which are quoted with approval in *Commonwealth v. Patch,* 98 Pa. Superior Ct. 464. We disagree with the broad enunciation of the applicable general rule as set forth in that case, but agree that the withdrawal of the plea of guilty should not be denied in any case where it is apparent that the ends of Justice will be served by permitting not guilty to be pleaded in its place.

In view of the care and thoroughness of the trial Judge in ascertaining that the defendant personally realized the effect and possible consequences of her

guilty plea, *it cannot fairly be said that she was ignorant of her rights or the consequences of her plea, or was acting under a justifiable misapprehension of material facts or of the law.*

*The fact that in the finding of the Court as to the degree of defendant's guilt and the sentence imposed, the expectations or hopes of appellant and her counsel were not realized is not the kind of "mistake or misapprehension" which in the interest of Justice, justifies the withdrawal of a plea of guilty.*      ..

An effort to establish an abuse of discretion by reason of the same kind of "misapprehension" as is here alleged, was rejected by this Court in *Commonwealth v. Green,* 396 Pa. 137, 151 A. 2d 241. In that case the Court pertinently said (page 144) : "At the time of resentencing, appellant's counsel petitioned for permission to withdraw a plea of guilty and enter a plea of not guilty; the ground for such request was that he, as counsel, after a conference with Judge MILNER, counsel for Crowson and Walker and an assistant district attorney, 'drew the conclusion' that Green's sentence would be no greater than life imprisonment and that he so advised his client. An examination of the record reveals no misapprehension of facts or law on the part of Green or his counsel, no doubt of the appellant's guilt, no defense whatsoever to the homicide and certainly no justifiable reason to submit this cause to a jury at this time. Such tactics have no place in the criminal law. As aptly stated by the Commonwealth, appellant now complains because of his 'attorney's mistaken foresight made clear by the cold realities of hindsight.'" To the same effect, see *Commonwealth ex rel. Mercer v. Banmiller,* 193 Pa. Superior Ct. 411, 165 A. 2d 121, where, under similar circumstances the Superior Court said (pages 414-415) : "He pleaded guilty on advice of counsel. He probably thought that the district attorney would recommend, and the court

would impose, a shorter sentence. [In the instant case the District Attorney did recommend, as he promised, a verdict of guilty of only voluntary manslaughter. As defendant could have been sentenced to imprisonment for six to 12 years upon conviction of voluntary manslaughter, the sentence imposed in this case of 4 to 8 years on a conviction of murder in the second degree could certainly be characterized as "lenient" (See §703 of the Act of June 24, 1939, P. L. 872, 18 P.S. §4703.)] This, however, does not entitle him to a writ of habeas corpus. *Where an accused pleads guilty, relying on his attorney's opinion as to the probable Commonwealth recommendation or actual sentence,* he will not be permitted later to withdraw his plea on the ground that he was ill advised. Commonwealth v. Green, 396 Pa. 137, 143, 144, 151 A. 2d 24 (1959)."

To permit defendant to withdraw her guilty plea under the circumstances here involved would make a mockery of the Courts and of the Law and would jeopardize Justice.

We find no abuse of discretion and no denial of any Constitutional right by the Court's refusal of defendant's application to withdraw her guilty plea.

The Test In Considering The Evidence

Defendant relies, as most defendants do in an appellate Court, on the testimony and the inferences which are favorable to her. As we have said very many times, this is not the law. In the recent case of *Commonwealth v. Gooslin,* 410 Pa. 285, 189 A. 2d 157, we said (page 287) : " ' ". . . 'It has become customary for a defendant in his argument before an appellate Court to base his claims and contentions upon his own testimony or that of his witnesses even after a jury has found him guilty. This, of course, is basic error. After

a plea or verdict of guilty, "we accept as true all of the Commonwealth's evidence upon which, if believed, the jury [or a Judge sitting as a jury] could have properly based its verdict: [citing numerous authorities]." ' " ' "

Moreover, it is well settled that a jury or a trial Court can believe all or a part of or none of a defendant's statements, confessions or testimony, or the testimony of any witness: *Commonwealth v. Melton,* 406 Pa. 343, 178 A. 2d 728; *Commonwealth v. Tyrrell,* 405 Pa. 210, 174 A. 2d 852; *Commonwealth v. Ballem,* 386 Pa. 20, 123 A. 2d 728; *Commonwealth v. Donough,* 377 Pa. 46, 50, 103 A. 2d 694; *Commonwealth v. Homeyer,* 373 Pa. 150, 153, 94 A. 2d 743; *Commonwealth v. Phillips,* 372 Pa. 223, 93 A. 2d 455.

## The Evidence

Mildred N. Simms, known as "Millie,"* was killed at No. 226 Dinwiddie Street, Pittsburgh, between 2:30 and 3:15 P.M. on September 29, 1962. The owner of the small apartment house at 226 Dinwiddie Street was a man named William M. Dupree. Dupree had a son named Albert McCormick who did not live on the premises. For about eight months prior to the homicide, Dupree had been living there in a meretricious relationship with defendant's daughter, Germaine Shields. Dupree and Germaine occupied an apartment on the first floor. Dupree rented a room in the house to "Millie," and another room to a boarder, Leonard L. Goins. Millie lived there for approximately two months before the homicide. She became friendly with both Dupree and Germaine and the three frequently ate breakfast together.

---

* Millie is sometimes spelled "Milly."

On the night before the homicide, Germaine had an argument with Dupree. She was jealous of Millie and asked Dupree to put Millie out. When he declined to do so for the alleged reason that she owed him money,* Germaine stated that she wanted to go back to live with her mother (the defendant) at the latter's home at 510 Hamilton Avenue, Duquesne, Pennsylvania. Thereupon, Dupree drove Germaine to her mother's house.

The next afternoon, Germaine asked her mother to go with her to Dupree's apartment so that she (Germaine) might obtain possession of some of her clothing. Defendant agreed to accompany Germaine to Dupree's home, not only for Germaine's purposes but also (as she said) to pick up a dress, a casserole, a punch bowl and some phonograph records allegedly belonging to her. A friend by the name of "Joe" drove Germaine and defendant to Dupree's home. They arrived at Dupree's home at about 2:30 P.M. Just prior to their arrival at Dupree's house, McCormick stopped there to see his father. He found no one present but Millie. After he and she had conversed a while, it was decided that he should go out and get some beer. When he returned with the beer, he found Germaine and defendant in the kitchen with Millie. He testified that defendant and Millie were having an angry argument as to whether Millie or Germaine should move out of the premises.

At about this time Germaine asked McCormick to help her open a locked closet in the hallway of the apartment where her clothes were stored and help her carry her things out to the automobile. McCormick went outside and neither Germaine nor McCormick witnessed what happened thereafter in the kitchen or in the living room of the Dupree apartment.

---

* Millie did not work but received money from two "boy friends."

A few minutes after McCormick had gone outside, defendant and Germaine came out.* Defendant handed him a large kitchen knife 11¼ inches long *with a blade 5¾ inches long, which was partly stained with blood.* She made no explanation for this unusual presentation. Germaine did not see the knife which defendant had handed to McCormick. When Germaine and her mother were outside the house, her mother said to her (but not in McCormick's hearing), "Mildred tried to hurt me and *I hurt her.*" Germaine also testified that without any further conversation the two women got in Joe's automobile and drove away.

A few moments later, Goins, the other roomer, appeared on the scene, saw the knife in McCormick's hand and suggested to McCormick the wisdom of wiping his fingerprints off the knife. McCormick did so, and then went into the house and laid the knife on the heater in the hall. From there, followed by Goins, he went to the living room where they found Millie lying in a pool of blood, which flowed from two mortal stab wounds in her neck. McCormick immediately called the police and asked for a police ambulance.

When the Pittsburgh police arrived, Millie was still alive. As she was being carried on a stretcher into the Mercy Hospital she twice said to one of the officers, *"Germaine's mother did it."* Millie died about three hours later. The police of course found the knife.

Defendant told several different stories of the killing—three oral and one written. Defendant frankly admitted that the knife with which Millie was killed was her knife.** She then stated to Police Officer Semar that there was a quarrel in Dupree's apartment

---

* Although it seems immaterial McCormick could not recall which of the two came out of the building first.

** She said that it belonged to a set of her kitchen knives, four in number.

and that "Millie Simms went at her with a knife and that she threw her over her shoulder and subsequently the wound had occurred." Then, on her way to the police station, defendant told Officer Semar that she didn't do it, but that *"her daughter Germaine Shields did it. It was her daughter that was involved in the stabbing—not her."* On cross-examination, Officer Semar testified (in connection with the testimony of another officer) that defendant said that "she had thrown her [Millie] over her shoulder and that the deceased had fell on the knife."

On Monday, October 1st, at 8:30 A.M., in the office of the Homicide Section of Police, defendant freely and voluntarily made and signed a statement as to the killing, after she had been advised of her Constitutional rights, including her right to refuse to make any statement whatever. In this written statement she said her daughter had told her that Millie said she was going to take her man (Dupree) from her; that Germaine picked up three records to take home with her, but Millie said she was not going to get a thing out of the house; that then Millie "run to the phone and said she was gonna call the police. When she started back to me she had that knife. Her and I got into a tussle and I shoved her. She fell over by the stand where the phone is on the floor. I said Lord have mercy, someone come here and help Millie. I goes on out the house and gets in the station wagon. Q. Did you stay there and attempt to help Mildred Simms after the stabbing? A. I bent down over Milly and called Dupree's son. I told him to get help and Germaine and I left with the station wagon full of clothes. They took me home and I stayed there till the police come."

Defendant stated that her knife had been in Dupree's house for several months, ever since May when she had prepared a meal for Dupree on one of the oc-

casions she had visited his apartment. However, *Dupree denied that her knife had ever been in his house before the day of the stabbing.*

After defendant had identified the knife as hers, she was asked the following questions and made the following answers: "Q. Did you see this knife when you were having this argument with Mildred Simms? A. Her and I was tusslin with the knife. Q. Did you pick this knife up to defend yourself with it? A. I keep saying her and I was tusslin with the knife. Q. What I want to know, Katherine,* is who had the knife first? A. Milly had brought that knife out of her pocket, . . . . Q. Katherine, just before the stabbing did you take the knife from her hand? A. When Milly come at me and we were tusslin, I shoved her like that and I'm sure I got that knife from her. Q. Now Katherine, you have the knife in your hand, I want you to tell me how Milly Simms got stabbed. A. As scared as I was, I'm telling the truth, I don't know. Q. Do you remember what hand you had the knife in? A. Well, I'm not left handed, I must to have had it in my right hand. Q. After Mildred Simms was stabbed, what did you do with the knife? A. I don't know."

### Defendant's Contentions and the Law of Murder and Voluntary Manslaughter

Defendant contends that the killing amounts in law at the most, to voluntary manslaughter and not to murder—indeed, she also contends that the killing was in self defense or accidental. Defendant bases her contentions principally upon parts of (a) her own oral statements and (b) her written statement, which are favorable to her. Of course this is not the test. A jury or trial Judge can believe, we repeat, some or all or

---

* Katherine is sometimes spelled with a "C".

none of the statements of a defendant or of a witness. In the instant case, depending upon the belief of the trial Judge in the credibility of the witnesses and such parts of their testimony as he believed to be credible, a jury-Judge could have found defendant (1) guilty of murder in the first degree from her intentional use of a deadly weapon on a vital part of the victim's body: *Commonwealth v. Carroll*, 412 Pa. 525, 194 A. 2d 911; *Commonwealth v. Tyrrell*, 405 Pa., supra; *Commonwealth v. Moore*, 398 Pa. 198, 202, 157 A. 2d 65; *Commonwealth v. Nelson*, 396 Pa. 359, 152 A. 2d 913; *Commonwealth v. Ballem*, 386 Pa., supra; *Commonwealth v. Heller*, 369 Pa. 457, 87 A. 2d 287; *Commonwealth v. Samuel Jones*, 355 Pa. 522, 526, 50 A. 2d 317; or (2) guilty of murder in the second degree on the ground that there was an unlawful unjustifiable killing with malice consisting of an intent to do serious bodily harm but not to kill: *Commonwealth v. Gooslin*, 410 Pa., supra; *Commonwealth v. Dorazio*, 365 Pa. 291, 74 A. 2d 125; *Commonwealth v. Drum*, 58 Pa. 9; or (3) not guilty because the killing was in self defense or accidental; or (4) guilty of voluntary manslaughter. This would have been the least justifiable of all, since the attendant circumstances and the statements made by defendant indicate at best for defendant (a) passion without a sufficient cause of provocation and (b) ample time to cool, if passion existed: *Commonwealth v. Nelson*, 396 Pa., supra; *Commonwealth v. Donough*, 377 Pa., supra; *Commonwealth v. Palermo*, 368 Pa. 28, 81 A. 2d 540; *Commonwealth v. Cargill*, 357 Pa. 510, 55 A. 2d 373; *Commonwealth v. Colandro*, 231 Pa. 343, 80 Atl. 571; *Commonwealth v. Paese*, 220 Pa. 371, 69 Atl. 891.

Murder is an unlawful killing of another person with malice aforethought, express or implied: *Commonwealth v. Gooslin*, 410 Pa., supra; *Commonwealth v. Carroll*, 412 Pa., supra, and numerous cases cited

therein; *Commonwealth v. Buzard,* 365 Pa. 511, 76 A. 2d 394. Malice express or implied is the hallmark, the criterion and the absolutely essential ingredient of murder. Malice in its legal sense exists not only where there is a particular ill-will, but also whenever there is a wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty. Legal malice may be inferred and found from the attending circumstances: *Commonwealth v. Carroll,* 412 Pa., supra; *Commonwealth v. Kravitz,* 400 Pa. 198, 161 A. 2d 861; *Commonwealth v. Buzard,* 365 Pa., supra; *Commonwealth v. Boden,* 399 Pa. 298, 159 A. 2d 894. Malice is present if defendant had an intent to kill or to inflict serious bodily harm upon the deceased: Cases supra and *Commonwealth v. Buzard,* 365 Pa., supra; *Commonwealth v. Dorazio,* 365 Pa., supra; *Commonwealth v. Drum,* 58 Pa., supra.

In *Commonwealth v. Carroll,* 412 Pa., supra, quoting from *Commonwealth v. Tyrrell,* 405 Pa., supra, we said (page 532) : " 'The essential difference in a nonfelony murder-killing between murder in the first degree and murder in the second degree is that murder in the first degree requires a specific intent to take the life of another human being: Commonwealth v. Ballem, 386 Pa. 20, 123 A. 2d 728; Commonwealth v. Dorazio, 365 Pa., supra; Commonwealth v. Malone, 354 Pa., supra; Commonwealth v. Chapman, 359 Pa. 164, 58 A. 2d 433; Commonwealth v. Jones, 355 Pa. 522, 50 A. 2d 317; Commonwealth v. Iacobino, 319 Pa. 65, 178 A. 823.'

"The specific intent to kill which is necessary to constitute in a nonfelony murder, murder in the first degree, may be found from a defendant's words or conduct or from the attendant circumstances together with all reasonable inferences therefrom, and may be inferred from the intentional use of a deadly weapon

on a vital part of the body of another human being: Commonwealth v. Tyrrell, 405 Pa., supra; Commonwealth v. Moore, 398 Pa. 198, 157 A. 2d 65; Commonwealth v. Nelson, 396 Pa. 359, 152 A. 2d 913; Commonwealth v. Ballem, 386 Pa. 20, 123 A. 2d 728; Commonwealth v. Heller, 369 Pa. 457, 87 A. 2d 287; Commonwealth v. Jones, 355 Pa. 522, 50 A. 2d 317."

In *Commonwealth v. Donough,* 377 Pa., supra, quoting from *Commonwealth v. Palermo,* 368 Pa., supra, we said (pages 52-53) : " ' "Voluntary manslaughter is a homicide intentionally committed under the influence of passion." Commonwealth v. Colandro, 231 Pa. 343, 350, 80 A. 571 (1911) ; Commonwealth v. Cargill, 357 Pa. 510, 513, 55 A. 2d 373 (1947). . . .'

"In Commonwealth v. Colandro, . . . the Court said (page 350) : '. . . "The term 'passion' as here used includes both anger and terror provided they reach a degree of intensity sufficient to obscure temporarily the reason of the person affected:" 21 Am. & Eng. Ency. of Law (2d ed.) 173. "Passion, as used in a charge defining manslaughter . . . means any of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection;" 6 Words & Phrases, p. 5227. "Although 'anger' is the passion usually existing in cases of this class, yet any other passion, as sudden resentment or terror, rendering the mind incapable of cool reflection, may reduce the grade of the crime :" 21 Cyc. 737. . . .' "

In *Commonwealth v. Paese,* 220 Pa., supra, the Court, speaking through Mr. Chief Justice MITCHELL, well said (page 373) :. "To reduce an intentional blow, stroke or wounding, resulting in death, to voluntary manslaughter, *there must be sufficient cause of provocation and a state of rage or passion, without time to cool,* placing the prisoner beyond the control of his reason, and suddenly impelling him to the deed. *If any*

*of these be wanting*—if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder: Com. v. Drum, 58 Pa. 9 (17)."

In *Commonwealth v. Gockley,* 411 Pa. 437, 192 A. 2d 693, the Court said (page 453) : ". . . prior false or contradictory or conflicting statements by the accused are admissible since the jury may infer therefrom that they were made with an intent to divert suspicion or to mislead the police or other authorities, or to establish an alibi or innocence, and hence are indicatory of guilt: Commonwealth v. Kravitz, 400 Pa. 198, 217, 161 A. 2d 861; Commonwealth v. Dickerson, 406 Pa. 102, 107, 176 A. 2d 421; Commonwealth v. Bolish, 381 Pa. 500, 524, 113 A. 2d 464; Commonwealth v. Sauders, 390 Pa. 379, 388, 134 A. 2d 890; Commonwealth v. Homeyer, 373 Pa. 150, 158, 94 A. 2d 743."

In the light of the testimony and the cases hereinabove set forth, a fact-finding Judge could justifiably have found beyond a reasonable doubt (1) that defendant fabricated parts of her statements with intent to divert suspicion by placing the blame for the killing on her daughter or otherwise to establish her innocence; (2) that she had a criminal intent; (3) that she had a particular ill-will against Millie when she went to Dupree's house with a large kitchen knife; (4) that she intentionally used her knife to wound or kill Millie; and (5) that she killed Millie unlawfully and without any legally justifiable provocation. It is clear that *defendant must have intentionally stabbed Millie in the neck because there were two large stab wounds*—if Millie had fallen on the knife when she was allegedly thrown by defendant over defendant's shoulder, it would not have caused *two* stabbings. Moreover, it is equally clear that there was insufficient anger or provocation to reduce this intentional stab-

bing to voluntary manslaughter. Judge McKenna justifiably found defendant guilty of murder and humanely and wisely found, in the light of all the circumstances in this case, that the killing amounted only to murder in the second degree.

Judgment and sentence affirmed.

Mr. Justice Cohen dissents.