656 A.2d 90

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Shawn WALKER, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 18, 1994.

Decided March 23, 1995.

84

86

James S. Bruno, Philadelphia, for S. Walker.

Catherine Marshall, Ronald Eisenberg, Karen A. Brancheau, Philadelphia, for Com.

Robert A. Graci, Harrisburg, for Atty. Gen.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION OF THE COURT

CASTILLE, Justice.

This is an automatic direct appeal from the judgment of sentence of death imposed on appellant, Shawn Walker, following a trial by jury in the Philadelphia County Court of Common Pleas. For the reasons set forth below, we affirm the judgment of sentence.

On March 3, 1992, appellant was brought to trial by jury in connection with the murder of Ricardo Thomas and the shooting of Lisa Johnson, appellant's ex-girlfriend and mother of their two children. The jury convicted appellant of murder in the first degree, aggravated assault, recklessly endangering another person, criminal trespass, possession of an instrument of crime, and carrying firearms on a public street. Following the sentencing hearing, the jury found that the two aggravating circumstances [1] outweighed the mitigating circumstance [2] and sentenced appellant to death. After trial counsel was permitted to withdraw, supplementary post-sentence motions were filed and evidentiary hearings were held on April 12, 1993 and June 8, 1993. On June 8, 1993, the post-sentence motions were denied and the trial court re-imposed the jury's sentence of death, as well as other terms of imprisonment on the other convictions.[3]

Initially, appellant argues that the jury's verdict was erroneous because appellant acted under a sudden and intense passion, making it impossible for him to act with the necessary

1. The two aggravating factors found by the jury were that: (1) in the commission of the offense appellant knowingly created a grave risk of death to another person in addition to the victim of the offense, 42 Pa.C.S. § 9711(d)(7); and (2) appellant committed a killing while in the perpetration of a felony of criminal trespass, 42 Pa.C.S. § 9711(d)(6).

2. The sole mitigating circumstance found by the jury was that appellant was under the influence of extreme mental or emotional disturbance, 42 Pa.C.S. § 9711(e)(2).

3. With respect to appellant's remaining convictions, the trial court sentenced him as follows: sixty (60) to two-hundred forty (240) months imprisonment for aggravated assault; twelve (12) to one hundred-twenty (120) months for criminal trespass; twelve (12) to sixty (60) months for violation of the Uniform Firearms Act; and twelve (12) to sixty (60) months for the possession of an instrument of crime.

intent required to establish murder in the first degree. As is required in all cases where the death penalty has been imposed, this Court must conduct an independent review of the sufficiency of the evidence. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26, 454 A.2d 937, 942 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). The test for a sufficiency of the evidence claim is whether the evidence, and all the reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner, is sufficient to establish that the jury could have reasonably determined that all the elements of the offenses were established beyond a reasonable doubt. *Commonwealth v. Burgos*, 530 Pa. 473, 476, 610 A.2d 11, 13 (1992). Using this standard, the record below establishes the following facts:

Appellant and Lisa Johnson lived together for a period of two years before she returned with their two sons to live with her parents, Gladys and Leon McKnight, in order to escape appellant's abuse. Thereafter, appellant repeatedly harassed Lisa by going over to the McKnight residence, after her parents had gone to work. According to the testimony of Lisa Johnson's sister, Tracey McKnight, appellant would come over to the McKnight residence almost every day and often threaten Lisa that if she did not get rid of her new boyfriend, he was going to kill her and her family. These acts eventually compelled Lisa to obtain a protection from abuse order. However, in spite of the order, appellant continued to harass and threaten her and her family. On one occasion, after Gladys McKnight told appellant that she would have to call the police if he did not leave the house, he told her to go ahead and that if she did, "I will blow your fucking brains out." (N.T. 2/27/92, at 94).

On April 22, 1993, the morning before the killing, appellant went to the McKnight residence and physically assaulted Lisa by striking her across the face after she refused to have sexual intercourse with him. Later in the day, appellant repeatedly called the McKnight residence demanding to speak to Lisa and inquiring as to whether her new boyfriend,

Denzell Brown was present. The deceased, Ricardo Thomas, who was the godfather of one of appellant's children, took one of these phone calls and ordered appellant to stop harassing Ms. Johnson. At approximately midnight, appellant once again telephoned Lisa and told her that he was coming over. He also threatened her by stating, "If I can't have you, ain't nobody going to have you." (N.T. 2/28/92, at 48).

By the time Denzell Brown and his friend and co-worker, Harry Smith, left the residence (around 2:00 a.m.), appellant still had not arrived. Although as they were leaving the neighborhood, they noticed a gray car parked around the block which was later identified as appellant's vehicle. Due to the McKnight's obvious concerns, Ricardo Thomas offered to sleep on the downstairs couch in order to protect Lisa in the event that appellant followed through on his threats. Lisa slept on another sofa in the same room.

Sometime between 3:00 a.m. and 3:30 a.m., appellant, who had been waiting in his car, broke through the front door, walked over to Ricardo Thomas, who was still sleeping on the couch, and shot him in the forehead and in the chest. Evidence was offered which indicated that the gun was fired from six to ten inches from the victim's head. Appellant then turned to Lisa who had awakened and said, "Lisa this is what you get for playing." (N.T. 2/28/92, at 53). Appellant then shot her two times in the head. The McKnights heard a gunshot but thought that it came from outside so they went back to bed.

The next morning, they found Ricardo Thomas dead on the couch in the fetal position. Lisa Johnson was discovered alive in a pool of blood and vomit and was rushed to the Hospital at the University of Pennsylvania. Mr. McKnight also noticed that the lock had been broken on the front door.

After interviewing the McKnights that same day, the police discovered that appellant had admitted himself to the Medical College of Pennsylvania, Psychiatric Division at around noon. The police went to the hospital and upon appellant's release asked him if he was willing to come in to police headquarters

for questioning concerning the shooting. Appellant voluntarily agreed and was taken to the homicide division of the Philadelphia police department. Thereafter, appellant was read his *Miranda* rights. After informing the police that he wanted to waive his rights, and that he was not under the influence of drugs or alcohol, appellant gave the following statement:

> I got to the house and pushed the door open. One guy was laying on the couch. We started wrestling on the couch and I grabbed my gun from out of my pants pocket and I started squeezing the trigger and the gun went off three times. Then I turned my head and I heard Lisa calling me all kind of bitches. She started asking me why I did that and she started saying that she hated me she hated me. Then I pointed the gun at her and I shot her two times. So then I drove off and sat in the car for a while.[4]

(N.T. 2/28/92, at 116–117).

Lisa Johnson regained consciousness three days later and told her mother that appellant shot her. As a result of her injuries, Lisa is only able to walk short distances; otherwise she is confined to a wheelchair.

▇▇▇▇ A criminal homicide constitutes murder in the first degree when the killing is committed intentionally, by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing. *Commonwealth v. Lark,* 518 Pa. 290, 305, 543 A.2d 491, 498 (1988); 18 Pa.C.S. § 2502.[5] Moreover, the use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill. *Commonwealth v. Butler,* 446 Pa. 374, 378, 288 A.2d 800, 802

---

4. Appellant's trial testimony differed from these statements in that he testified that Ricardo Thomas reached for a gun at which time he shot Ricardo in self-defense. Contrary to appellant's trial testimony, however, there were no signs of a struggle and no gun was found at the scene.

5. **18 Pa.C.S. § 2502. Murder.**
 (a) **Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.
 "**Intentional killing.**" Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

(1972); *see also, Commonwealth v. Meredith,* 490 Pa. 303, 311, 416 A.2d 481, 485 (1980) ("If a deadly force is knowingly applied by the actor to the person of another, the intent to take life is as evident as if the actor stated the intent to kill at the time the force was applied").

Here, the evidence established that after appellant threatened to kill his ex-girlfriend, appellant drove to the McKnight residence and waited in his car for an extended period of time. He then broke into the house and fatally shot Ricardo Thomas once in the head and once in the chest while he slept, and then after stating his intent to kill Lisa Johnson shot her two times in the head. This evidence was sufficient to establish that appellant acted with malice aforethought and with a specific intent to kill.

Appellant contends that during the night in question he became extremely angry after getting into an argument with Denzell Brown after discovering that he was Lisa's new boyfriend and that as a result he was acting under the "heat of passion" when he committed the killing. Under the Crimes Code, a person is guilty of voluntary manslaughter if at the time of the killing he acted under a sudden and intense passion resulting from serious provocation by the victim. 18 Pa.C.S. § 2503(a). At the outset, we note that appellant's assertion raised in his appeal for the first time directly conflicts with his testimony at trial where he stated:

I got out of the car and I walked down back to Lisa's house and I knocked on the door. And she asked who it was. And I said, it's me, Shawn. And she said come in. And I turned the door but the door wouldn't open. So I said, the door must be locked. She said, no, just push it hard. So I pushed it and the door opened up. When I went in, her and some guy was on the couch, they was hugged up. I said, you still got your company here so I'm going to leave. And then the guy jumped up, turned me around, and sucker-punched me in the face. He was getting ready to hit me again. That's when I pushed him down and he fell to the couch. And when he said he was going to kill me, he reached for his gun and I reached for mine and I shot him.

(N.T. 3/2/92, at 28–29). Clearly, these are not the words or actions of a person acting under the influence of a sudden and intense passion. *See Commonwealth v. Kirkland,* 413 Pa. 48, 65, 195 A.2d 338, 346 (1963) ("The term 'passion' as here used includes both anger and terror provided they reach a degree of intensity sufficient to obscure temporarily the reason of the person affected ... [p]assion, ... means any of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection.") (citations omitted).

Furthermore, appellant testified on direct that he previously learned about the possibility of Lisa's relationship with another man through his sister. In addition, Tracey McKnight, Lisa's sister, testified that appellant had repeatedly threatened Lisa prior to the night in question concerning her new boyfriend. Thus, appellant was aware of Lisa's new relationship well before he got into the argument with Denzell Brown. Moreover, appellant simply fails to demonstrate that there was sufficient provocation to incite a reasonable person into a killing rage. *Commonwealth v. Terry,* 513 Pa. 381, 401, 521 A.2d 398, 408 (1987), *cert. denied,* 482 U.S. 920, 107 S.Ct. 3198, 96 L.Ed.2d 685 (1987); *Commonwealth v. Pirela,* 510 Pa. 43, 507 A.2d 23 (1986). As such, the facts and circumstances of this case do not give rise to appellant's meritless claim that his actions were the result of a sudden and intense passion so as to render a reasonable person incapable of cool reflection. *See Commonwealth v. Terry, supra,* 513 Pa. 381, 521 A.2d 398 (where prison guard merely touched appellant and appellant beat the guard to death the provocation was insufficient to reduce the offense from first degree murder to manslaughter); *see also Commonwealth v. Pirela,* 510 Pa. 43, 50, 507 A.2d 23, 27 (1986) (appellant was not acting under the heat of passion where he threatened to kill the victim in retaliation for his brother's death more than 24 hours before the actual killing occurred).

Even assuming *arguendo* that appellant was acting under the heat of passion at the time he repeatedly made the threatening phone calls, a sufficient amount of time for cooling had elapsed between that time and the actual murder, espe-

cially where appellant waited in car for an extended period of time before committing the killing. *See Commonwealth v. Butler,* 446 Pa. 374, 378, 288 A.2d 800, 802 (1972) (killings did not occur under the heat of passion so as to reduce the degree of guilt to manslaughter where there was sufficient time for cooling between whatever provocation might have existed and the actual killings). *See also Commonwealth v. McCusker,* 448 Pa. 382, 390, 292 A.2d 286, 290 (1972) (the trier of fact must consider whether there was insufficient cooling time which would prevent a reasonable man from using his reasoning faculties). Accordingly, we conclude that the evidence was sufficient to support appellant's conviction of murder in the first degree.

Appellant's second claim is that the verdict was against the weight of the evidence because the Commonwealth failed to prove that appellant possessed malice or a specific intent to kill where the killing was a result of a mistaken belief that appellant was defending himself. However, the weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Jackson,* 506 Pa. 469, 475, 485 A.2d 1102, 1104 (1984); *Commonwealth v. Dreibelbis,* 493 Pa. 466, 469, 426 A.2d 1111, 1113 (1981). Furthermore, an appellate court is barred from substituting its judgment for that of the finder of fact. *Commonwealth v. Pronkoskie,* 498 Pa. 245, 251, 445 A.2d 1203, 1206 (1982). Thus, we may reverse the decision of the lower court only when the verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. *Commonwealth v. Whitney,* 511 Pa. 232, 239, 512 A.2d 1152 (1986). After examining the record, we find nothing to support appellant's claim that appellant acted in self-defense. This is especially evident where it was appellant who went uninvited to Lisa's house armed with a gun in the middle of the night and broke through the front door. Moreover, the jury was free to believe all, part, or none of appellant's claim that he was acting in self-defense. *Commonwealth v. Jack-*

*son, supra,* 506 Pa. 469, 485 A.2d 1102. The verdict hardly shocks one's conscience. Accordingly, this claim is rejected.

Next, appellant asserts that the trial court erred by denying his motion to suppress his confession. Appellant submits that his confession was not knowing and voluntary because he was still suffering from the effects of the pills he ingested before admitting himself into the hospital to receive treatment for stomach pains.[6] Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *Commonwealth v. Cortez,* 507 Pa. 529, 532, 491 A.2d 111, 112 (1985), *cert. denied,* 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985).

Here, the trial court's findings of fact were that after learning that appellant was about to be released from the Medical College of Pennsylvania, Sergeant Joseph Descher and Detective John Rechner spoke to a physician, Dr. Foster, concerning appellant's status. They were informed that appellant was able to be discharged and that there was no further reason to keep him hospitalized. The police officers then approached appellant and told him that he was wanted for questioning in regard to the shooting at the McKnight residence and asked if he would come down to the police headquarters. Per the officer's testimony, appellant did not appear to be under the influence of drugs or alcohol. After being informed by the police that he was not required to accompany the officers, appellant freely agreed to do so. Appellant was then taken, without handcuffs, to the homicide unit at around 9:00 p.m., and asked to be seated in the waiting room.

Approximately an hour and one half later, Detective Charles Bentham interviewed appellant. The detective informed appellant that he was a suspect in the shooting of Ricardo Thomas and Lisa Johnson and then informed him of his

6. Appellant admitted on direct testimony that he was not even aware of the type of pills that he took.

*Miranda* rights. Appellant never showed any signs of being under any sort of mind altering substance during his interview. This is corroborated by his own statement to the police:

Then I went to my Aunt Annette's house and I went to sleep. I thought that would make her believe that I stayed inside the house the whole night. Then I woke up and I felt real bad. Then I tried to kill myself. I drank some peroxide and I cut my left wrist. I took about 20 pills too. I took them at about noon. I took myself to the hospital. The pills didn't do anything for me, though. They just made me sick to my stomach.

Detective Bentham then asked appellant the following:

Q. When you came to this police unit were you under the influence of any drugs or narcotics?

A. No.

Q. How do you feel right now? How do you feel right now?

A. Pretty miserable. I feel real fucked up inside for what I did.

(N.T. 2/28/92, at 117). Clearly, by appellant's own admission he was not under the influence of any mind altering substances at the time of his confession. In addition, three police officers testified that appellant never appeared to be under the influence of alcohol or drugs. Moreover, Dr. Foster, a disinterested source, who unlike the police at that time was aware that appellant had taken an overdose of drugs, felt that appellant was sufficiently coherent and well enough so as to warrant his release from the hospital. Thus, because the factual findings are supported by the evidence of record, the trial court did not err in refusing to suppress appellant's voluntary confession.

 Appellant next advances three separate claims of ineffective assistance of trial counsel. When asserting ineffective assistance of counsel, appellant must demonstrate that: (1) the underlying claim is of arguable merit; (2) the particular course chosen by counsel did not have some reasonable basis designed to effectuate his interests; and (3) counsel's

ineffectiveness prejudiced him. *Commonwealth v. Edmiston,* 535 Pa. 210, 237, 634 A.2d 1078, 1092 (1993), *citing, Commonwealth v. Pierce,* 515 Pa. 153, 158, 527 A.2d 973, 975 (1987). Counsel is presumed to have acted in his clients's best interest; thus, it is appellant's burden to prove otherwise. *Commonwealth v. Hancharik,* 534 Pa. 435, 633 A.2d 1074 (1993); *Commonwealth v. Miller,* 494 Pa. 229, 233, 431 A.2d 233, 235 (1981).

Appellant, first argues that trial counsel was ineffective for failing to call character witnesses on his behalf. Specifically, appellant contends that three witnesses, who testified at the post-trial evidentiary hearings as to appellant's good character, would have testified as to the same had they been called at trial.

It is well settled that the reasonableness of counsel's investigative actions depends upon the information supplied by the accused. *Commonwealth v. Peterkin,* 511 Pa. 299, 319, 513 A.2d 373, 383 (1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). At the post-trial evidentiary hearing, trial counsel testified that he repeatedly informed appellant that he needed character witnesses at trial. Appellant, however, merely responded by telling trial counsel to speak to his mother.[7] Trial counsel pleaded with appellant's mother during the first day of the trial to make herself available as a character witness and to bring in other family members and friends who would be able to testify on his behalf. Appellant's mother, however, failed to reappear in court the following day and for the remainder of the trial.[8] After appellant's mother failed to cooperate, trial counsel again explained to appellant that the lack of character testimony would harm his defense and asked appellant whether he had any other suggestions as to whom he might call as a character witness. Appellant, however, refused to provide counsel with the names of potential character witnesses.

7. There was considerable confusion throughout the course of the trial as to whether this woman to whom appellant directed counsel was actually appellant's mother or aunt.

8. This woman also evaded the Commonwealth's subpoena.

Moreover, trial counsel testified that appellant never gave him the names of the three character witnesses who appeared at the post-trial motion and these witnesses never communicated that they were available for appellant. As we have recently held, "[a]n accused cannot refuse to cooperate with counsel in preparation of a particular trial strategy and then argue counsel's ineffectiveness for failing to pursue that course of action." *Commonwealth v. Pierce*, 537 Pa. 514, 645 A.2d 189, 196 (1994). Thus, trial counsel was not ineffective for failing to call these potential witnesses where he had no way of knowing that they were available.

 Second, appellant asserts that trial counsel was ineffective for failing to object to the evidence of appellant's prior abuse of Lisa Johnson and that trial counsel was ineffective for failing to request a mistrial with respect to the admission of testimony concerning appellant's attempt to steal the McKnight's minister's car during their grandmother's funeral. At the outset we note that appellant's appellate counsel failed to develop this claim at the post-trial evidentiary hearing, thus the issue is waived. However, since this Court has developed a relaxed standard regarding waiver rules in capital cases, we will address the underlying claim. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26, 454 A.2d 937, 942 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

 The admission into evidence of prior bad acts is within the sound discretion of the trial court and may be reversed only upon a showing that the court abused that discretion. *Commonwealth v. Banks*, 513 Pa. 318, 350, 521 A.2d 1, 17 (1987). While it is true that evidence of prior bad acts or unrelated criminal behavior are generally inadmissible, this Court has recognized that there are certain exceptions to the rule. *Commonwealth v. Story*, 476 Pa. 391, 400, 383 A.2d 155, 159 (1978). Evidence of criminal conduct which tends to establish malice, motive or intent for the offense charged is generally admissible. *Commonwealth v. Jones*, 499 Pa. 522,

526, 454 A.2d 8, 10 (1982); *Commonwealth v. Glover*, 446 Pa. 492, 495–496, 286 A.2d 349, 351 (1972). Furthermore, our courts will allow evidence of prior bad acts where the distinct crime or bad act, "was part of a chain or sequence of events which formed the history of the case and was part of its natural development". *Commonwealth v. Sam*, 535 Pa. 350, 359, 635 A.2d 603, 607 (1993), *citing, Commonwealth v. Lark*, 518 Pa. 290, 302, 543 A.2d 491, 497 (1988). Clearly, the evidence of appellant's repeated abuse of Lisa Johnson and threats were admitted for the purposes of proving not only appellant's malice, motive and intent to kill, but also to show the natural progression of the events leading up to the murder. Therefore, trial counsel was not ineffective for failing to object where the trial court was well within its discretion in admitting such evidence. *See Commonwealth v. Glass*, 486 Pa. 334, 343, 405 A.2d 1236, 1240 (1979) (testimony by the victim's sister as to appellant's prior acts of violence was admissible to establish motive, ill-will or malice toward the victim).

 With respect to appellant's claim of ineffectiveness of counsel based upon his trial counsel's failure to request a mistrial after Tracey and Gladys McKnight testified that appellant had slashed the tires of mourners at the funeral and had attempted to steal the minister's automobile, the record reveals that trial counsel objected to this testimony but that the trial court overruled the objection. Trial counsel then requested that the jury be charged with an instruction concerning the admission of such testimony. In response to trial counsel's request for a cautionary instruction, the trial court instructed:

Ladies and gentlemen of the jury, you have heard testimony of an incident that allegedly took place at Mrs. McKnight's mother's funeral. That testimony was permitted to be heard by you for one purpose and one purpose only. That is to show, if possible, a pattern of activity by the [appellant] as it relates to Lisa Johnson and her family. That is the only reason it is permitted. You are not to conclude from that testimony that this [appellant] is a bad person or

committed any crime whatsoever. He is on trial for the killing of Ricardo ... Thomas, and the assault on Lisa Johnson, and that was the only purpose that information was elicited.

(N.T. 2/27/92, at 112). This instruction adequately reflected the law. *Commonwealth v. Claypool,* 508 Pa. 198, 206, 495 A.2d 176, 179 (1985) (evidence of prior bad acts must be accompanied by a cautionary instruction explaining the limited purpose for its admittance). In addition, the trial court cautioned the jury during final instructions that they should only consider appellant's improper conduct to establish possible motive, not as evidence of appellant's guilt. Thus, whereas the jury is presumed to follow instructions, trial counsel was not ineffective for failing to request a mistrial. *Commonwealth v. Tilley,* 528 Pa. 125, 142, 595 A.2d 575, 583 (1991).

We also note that on both occasions the events surrounding the funeral came in response to a question asked by defense counsel during cross-examination. Thus, this testimony was properly elicited by the Commonwealth on redirect. *See Commonwealth v. Ford,* 539 Pa. 85, 105, 650 A.2d 433, 442 (1994) (where the defendant opens the evidentiary door to his past criminal conduct, the Commonwealth may cross-examine on that point).

Third, appellant asserts that trial counsel was ineffective for failing to object to the Commonwealth "death qualifying" the jury. Appellant's claim is that his rights to a fair trial and due process were denied when the Commonwealth struck individuals who were conscientiously opposed to the death penalty. This Court, as well as the United States Supreme Court, has repeatedly held that the "death qualification" process is not violative of the accused's right to a fair trial and due process under the law. *Commonwealth v. Aulisio,* 514 Pa. 84, 90, 522 A.2d 1075, 1078 (1987); *Adams v. Texas,* 448 U.S. 38, 50, 100 S.Ct. 2521, 2529, 65 L.Ed.2d 581 (1980) ("[t]he State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths"). Accordingly, trial counsel cannot be

faulted for failing to preserve a meritless claim. *Commonwealth v. Rawles*, 501 Pa. 514, 524, 462 A.2d 619, 624 (1983). Hence, we find that appellant's claims of ineffectiveness of counsel to be without merit.

 Next, appellant advances four arguments that the Pennsylvania death penalty statute is unconstitutional. First, appellant asserts that the statute provides the jury with no guidance as to how to weigh aggravating and mitigating circumstances and therefore is void for vagueness. In *Commonwealth v. Marshall*, 537 Pa. 336, 643 A.2d 1070, 1077 (1994), upon consideration of a virtually identical claim, we recently reaffirmed that 42 Pa.C.S. § 9711 was not unconstitutionally vague, relying primarily on this Court's decision in *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). In *Zettlemoyer*, this Court held that:

> The jury is simply asked to determine whether aggravating circumstances outweigh mitigating. 42 Pa.C.S.A. § 9711(c)(iv). Such a standard is not vague. Appellant would prefer a stricter weighing standard but, as we have seen, the Commonwealth has the burden of proving beyond a reasonable doubt every element of the offense and of the aggravating circumstances required to sustain a death sentence, and this Court is not at liberty to tamper with the constitutionally permissible legislative judgment regarding that weighing process.

*Id.*, 500 Pa. at 66, 454 A.2d at 963. Appellant fails to demonstrate why the well established reasoning of *Zettlemoyer* fails to dispose of his claims. Therefore, this claim must fail.

 Second, appellant argues that the death penalty statute is unconstitutional because there is no definition as to what constitutes a felony. The statute in question states in relevant part:

> **(d) Aggravating circumstances.**—Aggravating circumstances shall be limited to the following:

(6) The defendant committed a killing while in the perpetration of a felony.

42 Pa.C.S. § 9711(d)(6). This identical argument was rejected in *Commonwealth v. Basemore*, 525 Pa. 512, 582 A.2d 861 (1990), wherein this Court stated that "[a]s to the term 'felony' as used in the aggravating circumstance the defendant committed a killing while in the perpetration of a felony, it is clear that it is adequately defined by reference to our Crimes Code which specifically designates those crimes which are felonies. 18 Pa.C.S.A. § 101 *et seq.*" *Id.*, 525 Pa. at 532, 582 A.2d at 871. Hence, this claim is meritless.

Appellant also argues that the death penalty statute is unconstitutional because the aggravating circumstance of a "killing committed while in the perpetration of a felony," is also the definition of a felony murder, which is punishable only by life imprisonment. Thus, appellant contends that the jury is provided with an "unbridled choice" of penalties because felony murder could also rise to the imposition of the death penalty as an aggravating circumstance. This convoluted argument, however, confuses the guilt and penalty phases of the Crimes Code and fails to take into account that if the jury finds a specific intent to kill, the crime is first degree murder, which may be punishable by death.

Appellant's final constitutional challenge is whether the death penalty statute violates the due process clause by placing the burden of proving the mitigating circumstances upon the accused. This argument, however, was dismissed in *Commonwealth v. Zettlemoyer, supra*, 500 Pa. 16, 454 A.2d 937, in which this Court stated:

[T]he Commonwealth must prove every element necessary to establish murder of the first degree and every element necessary to establish one or more aggravating circumstance which the legislature has determined is of a sufficiently heinous nature as to require imposition of the death penalty. The accused is then given the opportunity to prove, by a preponderance of the evidence, that there are mitigating circumstances that might convince the jury that

the sentence should nevertheless be set at life imprisonment. Such an allocation is not offensive to due process. *Id.*, 500 Pa. at 65–66, 454 A.2d at 963. Appellant provides no compelling arguments warranting a disturbance of this Court's holding on this issue as set forth in *Zettlemoyer.* Accordingly, his meritless claims challenging the constitutionality of the death penalty statute are rejected.

■ Appellant also asserts that the trial court erred in permitting the jury to consider criminal trespass, a felony,[9] as an aggravating circumstance. As discussed above, the jury may find as an aggravating circumstance that the killing was committed while in the perpetration of a "felony." Felonies are expressly defined in the Crimes Code.[10] Appellant argues, however, that the legislature did not intend to include criminal trespass among those felonies that may be considered for purposes of determining aggravating circumstances. He fails to cite to any legislative history in support of his claim. Because 42 Pa.C.S. § 9711(d) expressly permits the use of "felonies" as an aggravating circumstance, of which criminal trespass is one, we find no merit to appellant's claim. Thus, criminal trespass may be considered as an aggravating circumstance and appellant's final claim must fail.

■ Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), this Court has a duty to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

9. Criminal trespass (breaking into an occupied structure) is specifically enumerated as a felony of the second degree. 18 Pa.C.S. § 3503(a)(2).

10. 18 Pa.C.S. § 101, *et seq.*

42 Pa.C.S. § 9711(h)(3). After reviewing the record below, we conclude that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor. In addition, the evidence supports the finding of at least one aggravating circumstance specified in 42 Pa.C.S. § 9711(d). Moreover, in accordance with *Commonwealth v. Zettlemoyer*, 500 Pa. at 63, 454 A.2d at 961, we have reviewed the sentencing data compiled by the Administrative Office of the Pennsylvania Courts (AOPC) pertaining to similar cases and conclude that the sentence of death imposed upon appellant is not excessive or disproportionate to the sentences imposed in similar cases. *See Commonwealth v. Frey*, 504 Pa. 428, 443, 475 A.2d 700, 707–08, *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). Accordingly, we affirm the verdict and sentence of death imposed upon appellant, Shawn Walker, by the Court of Common Pleas of Philadelphia County.[11]

PAPADAKOS, J., did not participate in the decision of this case.

MONTEMURO, J., is sitting by designation.

11. The Prothonotary of the Supreme Court is directed to transmit, as soon as possible, the complete record of the case *sub judice*, including the record of trial, sentencing hearing, imposition of sentence and review by this Court to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).